404 S.E.2d 750

**Saeed MAHMOODIAN, M.D., Plaintiff Below, Appellee,**

v.

**UNITED HOSPITAL CENTER, INC. and Bruce C. Carter, Defendants Below, Appellants;**

**Ali Rahimian, M.D., and Florencia C. Lopez, M.D., Defendants Below.**

No. 19504.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 6, 1991.

Decided April 25, 1991.

Herbert G. Underwood, Irene M. Keeley, Matthew J. Mullaney, Steptoe & Johnson, Clarksburg, for appellants.

Jerald E. Jones, Kathryn K. Allen, West & Jones, Clarksburg, for appellee.

McHUGH, Justice:

This appeal involves the revocation of a physician's staff appointment privileges as a member of the medical staff of a private hospital. The issues include whether such a revocation is subject to judicial review and, if so, the scope of that review, as well as whether such a revocation may be premised exclusively upon disruptive behavior of a competent physician which may affect adversely the quality of patient care at the hospital. We conclude that the Circuit

1. The other two defendants named below, Ali Rahimian, M.D., and Florencia C. Lopez, M.D., are not parties to this appeal.

2. Dr. Mahmoodian contends that UHC is a "state actor" which must adhere to federal and state constitutional "due process" requirements when deciding to revoke or otherwise to affect adversely the medical staff appointment privileges of a physician. In support of this contention Dr. Mahmoodian argues that UHC serves the public interest in community health; receives funds from governmental sources; and is subject to some governmental regulation, such as licensing, health care cost containment, statu-

Court of Harrison County improperly granted a permanent injunction against the revocation of medical staff appointment privileges in this case and, accordingly, we reverse, for the reasons stated in this opinion.

## I.

### PROCEDURAL HISTORY

The record in this case is voluminous, reflecting both the many steps in the decision-making process and the thoroughness of the evidence received.

The appellants, two of the defendants below, are the United Hospital Center, Inc., of Clarksburg, West Virginia ("UHC"), and Bruce C. Carter, UHC's president.[1] The appellee, the plaintiff below, is Saeed Mahmoodian, M.D. ("Dr. Mahmoodian"). Dr. Mahmoodian is a physician, licensed to practice medicine in the State of West Virginia. He is board certified in obstetrics and gynecology. He had been granted medical staff appointment privileges in obstetrics and gynecology at UHC or its predecessor corporation for about eighteen years at the time the complaint for injunctive relief was filed in the circuit court. Dr. Mahmoodian does not have medical staff appointment privileges at any other hospital and is not licensed to practice medicine in any other state.

 UHC is a private, not-for-profit hospital incorporated under the laws of the State of West Virginia. It was created voluntarily by private individuals. It is operated by an elected board of directors. It is not owned or operated by any governmental entity.[2]

torily required consumer representation on hospital boards of directors and statutorily required open proceedings of hospital boards of directors.

The Court rejected such a public entity argument in *State ex rel. Sams v. Ohio Valley General Hospital Association,* 149 W.Va. 229, 140 S.E.2d 457 (1965) (syl. pts. 2–3 and 149 W.Va. at 234–37, 140 S.E.2d at 460–62). *See also Queen v. West Virginia University Hospitals, Inc.,* 179 W.Va. 95, 103–105, 365 S.E.2d 375, 383–85 (1987) (public hospital; *Sams* distinguished); *Orteza v. Monongalia County General Hospital,* 173 W.Va. 461, 464–466, 318 S.E.2d 40, 43–45

## A. *Proceedings Before the Medical Staff*

In February, 1988, UHC commenced against Dr. Mahmoodian the "corrective action" process at issue here, pursuant to articles VII and VIII of UHC's medical staff bylaws. Dr. Mahmoodian was notified in writing of the charges, including "a practice of harassment of employees and physicians" at UHC. An ad hoc investigative committee, consisting of four members of UHC's medical staff who were not obstetricians/gynecologists, was formed, even though the medical staff bylaws did not require such a committee. The investigative committee heard informal testimony and received affidavits. Dr. Mahmoodian informally testified before the investigative committee. He was allowed to be represented by an attorney at the investigative committee proceedings.

The investigative committee ultimately recommended unanimously that Dr. Mahmoodian's medical staff appointment privileges at UHC be revoked for a virtually continuous pattern of disruptive and unprofessional behavior affecting UHC's medical staff physicians and obstetrical nurses and patients. This behavior had created a work environment detrimental to the delivery of quality patient care.[3]

The executive committee of the medical staff, consisting of fourteen of the ninety medical staff members, adopted unanimously the investigative committee's recommendation. The only obstetrician/gynecologist on the medical staff executive committee abstained from voting.[4] Dr. Mahmoodian thereafter requested and received an evidentiary hearing before an ad hoc hearing committee consisting of three medical staff members who were not obstetrician/gynecologists and who had not participated in the investigative process. An impartial local attorney served as a hearing officer. With the agreement of the hearing committee, both Dr. Mahmoodian and the executive committee of the medical staff were represented by an attorney at the evidentiary hearing before the hearing committee. The hearing committee heard live testimony, including Dr. Mahmoodian's. In addition, both the executive committee, over Dr. Mahmoodian's objection, and Dr. Mahmoodian were permitted to

---

(1984) (*Sams* quoted approvingly in light of United States Supreme Court cases and other post–1973 federal cases discussed). The contrary opinion in *Sams v. Ohio Valley General Hospital Association,* 413 F.2d 826, 828 (4th Cir. 1969) (receipt of federal funds converts private hospital into governmental actor), was overruled in *Modaber v. Culpepper Memorial Hospital, Inc.,* 674 F.2d 1023, 1025–26 (4th Cir.1982), in light of United States Supreme Court opinions after 1973.

This Court believes that an extensive discussion of this public hospital/private hospital dichotomy distracts attention from more significant issues in this case. The limited record before us on the point supports the factual finding of the Circuit Court of Harrison County that UHC is a private hospital for purposes of personnel decisions. Our analysis will, therefore, be based upon UHC's private status.

We do note that the *scope of judicial review* of health care peer review decisions adversely affecting the privileges of a medical staff *member* is essentially the *same* for *private and public* hospitals. While such decisions of public hospitals must be reached after affording "due process," and such decisions of private hospitals must be reached after affording "fair procedures," recent federal legislation will encourage essentially *all* hospitals to use the *same procedures. See infra* note 10.

3. The investigative committee also recommended that Dr. Mahmoodian's clinical privileges to perform a certain type of surgery (a Wertheim, or "radical," hysterectomy with pelvic lymphadenectomy) be suspended, due to apparent inexperience or incompetence, even if Dr. Mahmoodian's medical staff appointment privileges would not be revoked completely. This appeal does not involve that matter.

4. Dr. Mahmoodian's contention to the contrary notwithstanding, UHC's medical staff bylaws did not require any investigative committee's recommendation to be submitted initially to the entire medical staff. The executive committee of the medical staff was empowered under the bylaws to vote upon the investigative committee's recommendation prior to submission of the matter to the entire medical staff. Submission of the matter to the entire medical staff occurred here after the *hearing* committee's recommendation. The medical staff bylaws were followed in this regard. Moreover, this procedure avoided any claim that the entire medical staff had "prejudged" the matter by voting on the investigative committee's recommendation prior to voting on the hearing committee's recommendation.

submit hearsay testimony.[5] Dr. Mahmoodian was afforded the opportunity to cross-examine any witness at the evidentiary hearing and to call his own witnesses.

After the evidentiary hearing the hearing committee confirmed unanimously the medical staff executive committee's recommendation to revoke Dr. Mahmoodian's medical staff appointment privileges at UHC. Pursuant to § 8.05(h) of UHC's medical staff bylaws, the hearing committee concluded that the medical staff executive committee's recommendation did not "lack any factual basis" and was not "arbitrary, unreasonable or capricious."[6] The hearing committee found that the weight of the evidence indicated that Dr. Mahmoodian had instigated the turmoil and hostility in the obstetrical department of UHC and that the potential existed that such behavior would affect patient care adversely. Revocation was recommended in lieu of less severe discipline because Dr. Mahmoodian previously had been reprimanded formally on one occasion, and his medical staff appointment privileges had been suspended for a year on another occasion, for similar conduct. In addition, Dr. Mahmoodian refused to accept any responsibility for any of the turmoil in the obstetrical department of UHC.

The entire medical staff of UHC subsequently received Dr. Mahmoodian's written response to the charges and thereafter voted 32–17 to recommend to UHC's board of directors that Dr. Mahmoodian's medical staff appointment privileges be revoked. No obstetrician/gynecologist on the medical staff voted.

### B. *Proceedings Before the Hospital Board*

Dr. Mahmoodian, accompanied by an attorney, later met with the appellate review committee of UHC's board of directors. The appellate review committee sat as an appellate body, under UHC's medical staff bylaws, to review the personnel decision of the medical staff. In December, 1988, the appellate review committee of UHC's board of directors affirmed the medical staff's decision to revoke Dr. Mahmoodian's medical staff appointment privileges, effective at the end of the day on January 31, 1989, and Dr. Mahmoodian was notified in writing of that decision. No obstetrician/gynecologist and no person who had participated in any of the medical staff proceedings voted as a member of the board of directors' appellate review committee.

### C. *Proceedings Before the Circuit Court*

Dr. Mahmoodian subsequently brought a civil action in the Circuit Court of Harrison County, West Virginia ("the trial court"), primarily to obtain an injunction against UHC's revocation of Dr. Mahmoodian's medical staff appointment privileges. After a hearing the trial court, in February, 1989, denied Dr. Mahmoodian's request for a preliminary injunction. Thereafter, Dr. Mahmoodian requested this Court to grant a preliminary injunction. In April, 1989, this Court granted Dr. Mahmoodian's request for a *preliminary* injunction.[7] On November 30, 1989, the trial court, feeling "constrained to defer" to this Court's ruling granting a preliminary injunction, en-

---

5. According to § 8.05(g) of UHC's medical staff bylaws, the hearing need not be conducted strictly according to rules of law relating to the examination of witnesses or presentation of evidence. Instead, any relevant matter upon which reasonable persons customarily rely in the conduct of serious affairs is to be considered, regardless of the existence of any common-law or statutory rule which might make evidence inadmissible over objection in a civil or criminal action in a court of law. As stated in § 8.05(j) of the medical staff bylaws, the purpose of a hearing is to resolve, on an intra-professional basis, matters bearing on professional competency and conduct.

6. Like many private and public health care facilities, UHC's medical staff bylaws had been based upon the model of, and approved by, an independent, nongovernmental organization known as the Joint Commission on the Accreditation of Health Care Organizations, formerly called the Joint Commission on the Accreditation of Hospitals. As required by state regulations, UHC's board of directors had also approved these bylaws. *See* 5 *W.Va.Code of State Rules* § 64–12–7.2.1(a)(2) (1987).

7. The trial court later certified certain questions to this Court after denying a motion to dissolve the preliminary injunction. This Court declined to docket the certified questions.

tered an order granting the *permanent* injunctive relief requested by Dr. Mahmoodian. The trial court did not, however, change its findings of fact made when earlier denying a preliminary injunction.

UHC and its president, Mr. Carter, have brought this appeal. This Court is the seventh body to hear this matter (after the investigative committee, the medical staff executive committee, the hearing committee, the full medical staff, the appellate review committee of the hospital's board of directors and the circuit court).

## II.

### SCOPE OF JUDICIAL REVIEW

#### A. *The Law*

The threshold question in this case is whether the revocation of a physician's medical staff appointment privileges at a private hospital is subject to judicial review and, if so, what is the scope of that review.

In syllabus point 4 of *State ex rel. Sams v. Ohio Valley General Hospital Association*, 149 W.Va. 229, 140 S.E.2d 457 (1965), the Court held that "[t]he governing authorities of a private hospital, in the exercise of their discretion, have the absolute right to *exclude* licensed physicians from its medical staff and such action is not subject to judicial review." (emphasis added) *Sams* involved, however, the denial of an *initial appointment* to a private hospital's medical staff and did not speak to the precise question presented here, specifically, whether a decision of a private hospital adversely affecting a medical staff member's previously granted privileges at that hospital is subject to judicial review.[8]

Utilizing breach of contract principles, most courts explicitly addressing the issue presented here have held, and we hereby hold, that the decision of a private hospital to revoke, suspend, restrict or to refuse to renew the staff appointment or clinical privileges of a medical staff member is subject to limited judicial review to ensure that there was substantial compliance with the hospital's medical staff bylaws governing such a decision, as well as to ensure that the medical staff bylaws afford basic notice and fair hearing procedures, including an impartial tribunal. *See, e.g., Shulman v. Washington Hospital Center*, 222 F.Supp. 59, 63, 64 (D.D.C. 1963); *Eidelson v. Archer*, 645 P.2d 171, 175 n. 13 (Alaska 1982) (citing cases from other jurisdictions); *Gaenslen v. Board of Directors*, 185 Cal.App.3d 563, 568, 232 Cal.Rptr. 239, 241–42 (1985); *Gianetti v. Norwalk Hospital*, 211 Conn. 51, 61–67, 557 A.2d 1249, 1254–56 (1989) (citing cases from other jurisdictions); *Adkins v. Sarah Bush Lincoln Health Center*, 129 Ill.2d 497, 506–07, 509–10, 514, 136 Ill.Dec. 47, 51–52, 53, 55, 544 N.E.2d 733, 737–38, 739, 741 (1989); *Pepple v. Parkview Memorial Hospital, Inc.*, 536 N.E.2d 274, 276 (Ind. 1989); *Porter Memorial Hospital v. Malak*, 484 N.E.2d 54, 61 (Ind.Ct.App.1985); *State ex rel. Willman v. St. Joseph Hospital*, 684 S.W.2d 408, 411, 412 (Mo.Ct.App. 1984), *application to transfer denied* (Mo. Feb. 26, 1985); syl. pt. 2, *Gotsis v. Lorain Community Hospital*, 46 Ohio App.2d 8, 345 N.E.2d 641 (1974) (citing, in body of opinion, cases from other jurisdictions); *Miller v. Indiana Hospital*, 277 Pa.Super. 370, 374–78, 380, 419 A.2d 1191, 1193–94,

---

**8.** *Sams* and *State ex rel. Bronaugh v. City of Parkersburg*, 148 W.Va. 568, 572, 136 S.E.2d 783, 786 (1964) (dicta; public hospital), are consistent with the clear majority rule elsewhere of nonreview by the courts of private hospital's decisions denying initial appointments to such hospitals' medical staffs. For collections of cases on that point, including the approximately ten jurisdictions which follow the minority rule of subjecting private hospital's medical staff initial appointment decisions to judicial review of the merits, see *Barrows v. Northwestern Memorial Hospital*, 123 Ill.2d 49, 121 Ill.Dec. 244, 525

N.E.2d 50 (1988) (following majority rule of nonreview); *Hottentot v. Mid-Maine Medical Center*, 549 A.2d 365 (Me.1988) (following majority rule of nonreview); annotation, *Exclusion of or Discrimination Against Physician or Surgeon by Hospital*, 37 A.L.R.3d 645 (1971 & Supp. 1990), especially § 3 thereof.

A very comprehensive discussion of the propriety of judicial review of the internal affairs of private associations is contained in Note, *Developments in the Law—Judicial Control of Actions of Private Associations*, 76 Harv.L.Rev. 983 (1963).

1196 (1980), *appeal denied* (Pa. Oct. 1, 1980).[9]

■ The judicial reluctance to review the medical staffing decisions of private hospitals, by way of injunction, declaratory judgment or otherwise, reflects the general unwillingness of courts to substitute their judgment on the merits for the professional judgment of medical and hospital officials with superior qualifications to make such decisions. Furthermore, a private hospital's actions do not constitute state action and, therefore, are not subject to scrutiny for compliance with procedural "due process," which is constitutionally required when there is state action. However, there are basic, common-law procedural protections which must be accorded a medical staff member by a private hospital in a disciplinary proceeding which could seriously affect his or her ability to practice medicine. Such basic procedural protections include notice of the charges and a fair hearing before an impartial tribunal. If a private hospital's medical staff bylaws provide these basic procedural protections, and if the bylaws' procedures are followed substantially in the particular disciplinary proceeding, a court usually will not interfere with the medical peers' recommendation and the hospital's exercise of discretion on the merits. *See, e.g., Adkins v. Sarah Bush Lincoln Health Center,* 129 Ill.2d 497, 507, 509–10, 514, 136 Ill.Dec. 47, 52,

53, 55, 544 N.E.2d 733, 738, 739, 741 (1989); *Friedman v. Memorial Hospital of South Bend, Inc.,* 523 N.E.2d 252 (Ind.Ct.App. 1988).

In this regard the fact that individuals conducting good-faith health care peer review are statutorily immunized from civil liability for damages evinces a public policy encouraging health care professionals to monitor the competency and professional conduct of their peers in order to safeguard and improve the quality of patient care. *See W. Va. Code,* 30–3C–1 to 30–3C–3, as amended; 42 *U.S.C.* §§ 11101–11152, as amended.[10] While these peer review immunity statutes do not foreclose judicial review in proceedings seeking injunctive or declaratory relief, *see* H.R.Rep. No. 903, 99th Cong., 2d Sess. 9, *reprinted in* 1986 *U.S. Code Cong. & Adm.News* 6384, 6391, it is evident that the intent of these statutes was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise.[11]

Further support for the conclusion that judicial review of health care peer review decisions should be narrow in scope is furnished by the fact that, under the last paragraph of *W. Va. Code,* 30–3–14(b) [1986, 1989], "any disposition of a [medical licens-

---

**9.** *But see Sarin v. Samaritan Health Center,* 176 Mich.App. 790, 793–95, 440 N.W.2d 80, 82–83 (1989) (no judicial review of private hospital's decision to terminate medical staff privileges, not even to ensure compliance with medical staff bylaws' methods for reaching that decision); *Medical Center Hospitals v. Terzis,* 235 Va. 443, 445–46, 367 S.E.2d 728, 729–30 (1988), *as modified upon grant of reh'g* (statute on judicial review of hospitals' decisions adversely affecting existing medical staff members' privileges does not authorize judicial review of procedures employed by hospitals in reaching such decisions, as long as hospitals' decisions are in writing and are based upon certain statutorily permitted reasons). ·

**10.** Under the Federal Health Care Quality Improvement Act of 1986, 42 *U.S.C.* §§ 11101–11152, as amended, both public and private hospitals are encouraged to comply with that Act's standards for adequate notice and fair hearing with respect to health care peer review, in order

to be immune generally from monetary damages. *See generally* Colantonio, *The Health Care Quality Improvement Act of 1986 and Its Impact on Hospital Law,* 91 W.Va.L.Rev. 91 (1988). This federal legislation generally applies to immunize against any state civil liability for damages pertaining to health care peer review actions commenced on or after October 14, 1989. 42 *U.S.C.* § 11111(c)(1) (1988).

**11.** In an opinion involving events prior to the effective date of the Federal Health Care Quality Improvement Act of 1986, the Supreme Court of the United States observed that the review by a state's judiciary of medical peer review decisions typically is of a very limited nature; a court usually would not address the merits but would ensure that a reasonable procedure was afforded and that there was evidence from which it could be found that the professional conduct posed a threat to patient care. *Patrick v. Burget,* 486 U.S. 94, 104–05, 108 S.Ct. 1658, 1665, 100 L.Ed.2d 83, 94 (1988).

ing] case by the [West Virginia] board [of medicine] does not preclude any action by a hospital, other health care facility or professional society ... to suspend, restrict or revoke the privileges or membership of such physician[.]" Again, the legislative intent for medical staffing decisions is to defer generally to the judgment and discretion of the health care peers and hospital governing authorities.

We note, too, that there is no statute in this state expressly providing for appellate review by the courts of health care peer review decisions. This fact suggests a legislative intent that there be a limited scope of judicial review in proceedings invoking, for example, the extraordinary jurisdiction of courts to award injunctions. "In so specialized and sensitive an activity as governing a hospital, courts are well advised to defer to those with the duty to govern." *Nanavati v. Burdette Tomlin Memorial Hospital,* 107 N.J. 240, 251, 526 A.2d 697, 702–03 (1987). Underlying the limited scope of judicial review of health care peer review decisions is an awareness that courts should allow hospitals, as long as they proceed fairly, to run their own business. That awareness is tempered by the recognition that physicians need hospital medical staff appointment privileges and clinical privileges to serve their patients; therefore, hospitals must treat physicians fairly in making decisions about those privileges. *Id.* at 249–50, 526 A.2d at 702.

### B. *Fairness of Hearing Procedures Here*

Dr. Mahmoodian claims that UHC in one aspect did not comply substantially with the bylaws of its medical staff[12] and in another aspect did not provide a fair procedure for revocation of his staff appointment privileges. This Court disagrees.

■ Dr. Mahmoodian contends that it was an unfair procedure to allow members of the investigative committee to testify before the hearing committee as to their interpretation of what other persons had said before the investigative committee.

Dr. Mahmoodian argues that this procedure, over his objection at the time, denied him his right to confront and cross-examine these other persons not appearing as witnesses at the evidentiary hearing before the hearing committee.

Dr. Mahmoodian was not denied his right to cross-examine those persons who were witnesses at the evidentiary hearing. The medical staff and the hospital lacked the power to subpoena persons to be witnesses. The hearsay testimony in question certainly was not the only evidence before the hearing committee; there was substantial evidence supporting the charges of disruptive conduct by Dr. Mahmoodian and supporting the finding that such conduct was creating a work environment detrimental to the quality of patient care. On the critical question of whether Dr. Mahmoodian's disruptive conduct could threaten the care of obstetrical patients at the hospital, Dr. Mahmoodian had full opportunity at the evidentiary hearing to cross-examine the members of the investigative committee whose opinions it was that Dr. Mahmoodian's conduct put obstetrical patients at risk. In addition, prior to the evidentiary hearing, Dr. Mahmoodian had access to the written materials relied upon by the medical staff executive committee, and Dr. Mahmoodian had the opportunity at the evidentiary hearing to rebut the adverse evidence. The record indicates that he was thoroughly prepared to rebut all of the adverse evidence at the evidentiary hearing. It is interesting to note in this regard that Dr. Mahmoodian utilized the same form of evidence about which he complains, by submitting a few favorable letters from third parties who were not witnesses at the evidentiary hearing.

The procedure in question was reasonable for peer review. *Silver v. Castle Memorial Hospital,* 53 Haw. 475, 485, 53 Haw. 563, 497 P.2d 564, 571, 572, *cert. denied,* 409 U.S. 1048, 93 S.Ct. 517, 34 L.Ed.2d 500 (1972); *Miller v. Indiana Hospital,* 277 Pa.Super. 370, 376–78, 419 A.2d

---

**12.** *See supra* note 4. As stated therein, this Court disagrees with Dr. Mahmoodian on this point.

1191, 1194 (1980), *appeal denied* (Pa. Oct. 1, 1980). The procedure here certainly complied with the medical staff bylaws, which authorized an evidentiary hearing without strict adherence to evidentiary rules applicable to civil or criminal trials in courts of law. *See supra* note 5. Also, each of the procedural rights afforded Dr. Mahmoodian would satisfy the hearing standards established by the Federal Health Care Quality Improvement Act of 1986. 42 *U.S.C.* § 11112(b)(3) (1988).[13]

As found by the trial court, there was substantial compliance with the hospital's medical staff bylaws in this case, and we believe that those bylaws afforded Dr. Mahmoodian basic notice and fair hearing procedures.

## III.

## BYLAWS ON DISRUPTIVE CONDUCT

Dr. Mahmoodian challenges the revocation of his medical staff appointment privileges upon the basis of his disruptive conduct. He asserts: (1) that the medical staff bylaws are vague on this point; (2) that disruptive conduct of a medical staff member does not constitute a legally sufficient ground for revoking or otherwise affecting adversely a medical staff member's staff appointment privileges at a hospital, unless there is a "substantial" and "specific" threat to patient care from that conduct; and (3) that there was insufficient evidence supporting the hospital's decision to revoke his staff appointment privileges. This Court disagrees with each of these assertions.

### A. *Vagueness of Disruptive Conduct Bylaws*

The pertinent part of section 7.01 of UHC's medical staff bylaws provides:

Whenever the activities or professional conduct of any practitioner with clinical privileges are considered to be lower than the standards or aims of the medical staff or to be *disruptive to the operations of the hospital* or if any such practitioner is exercising or intending to exercise unauthorized clinical privileges, corrective action against such practitioner may be requested[.]

(emphasis added) In addition, section 3.02 of UHC's medical staff bylaws provides, in relevant part, that one of the qualifications for membership is "an ability to *work* with others" so as to assure the medical staff and the hospital's governing board "that any patient treated by [the physician in question] will be given a high quality of medical care[.]" (emphasis added)

Consistent with the authorities elsewhere, such as *McElhinney v. William Booth Memorial Hospital,* 544 S.W.2d 216 (Ky.1976), this Court holds that a private or a public hospital, regardless of the breadth of discretion that is extended to it, may revoke or otherwise affect adversely the staff appointment or clinical privileges of a medical staff member only if, as an element of basic notice, the medical staff bylaws provide a reasonably definite standard proscribing the conduct upon which the revocation or other adverse action is based. *Id.* at 218.[14]

Here, the medical staff bylaws proscribe professional conduct which is "disruptive to the operations of the hospital," and the bylaws require a medical staff member to have "an ability to work with others" in the sense that high quality patient care will be provided. Identically worded medical staff bylaws were before the court in, for example, *McMillan v. An-*

---

**13.** Documentary evidence, without any testimonial evidence, may be a fair procedure in some medical peer review hearings. *See Woodbury v. McKinnon,* 447 F.2d 839, 844 (5th Cir.1971).

**14.** In *McElhinney,* the court concluded that the bylaw there was impermissibly vague. Unlike here, however, the bylaw in *McElhinney* condemned only "gross unethical or moral misconduct[.]" 544 S.W.2d at 218. The court believed such broad language did not give sufficient no-

tice that the inability to work with other physicians was proscribed. It stated, though, that it "express[ed] no opinion as to the validity of a reasonably definite standard undertaking to proscribe and make a cause of termination [the] inability to work in harmony with other hospital personnel." *Id.* The opinion also noted that the physician's abrasive conduct could not in that case be regarded in any manner as detrimental to patient care. *Id.* at 217.

*chorage Community Hospital,* 646 P.2d 857 (Alaska 1982), and the court there decided that a post-hearing revocation of staff appointment privileges, rather than a prehearing suspension, would have been proper, under the circumstances, for a physician's disruptive conduct, that is, the inability of the physician to work with others. The court believed the relevant bylaws were clear. *Id.* at 858 n. 1, 862, 867. *See also Huffaker v. Bailey,* 273 Or. 273, 275–76, 540 P.2d 1398, 1399–1400 (1975) (medical staff bylaws requiring physicians' ability to work with others to assure "high quality of medical care" was not impermissibly vague).

Accordingly, we believe sections 7.01 and 3.02 of the medical staff bylaws in this case set forth a reasonably definite standard of professional conduct for purposes of basic notice to medical staff members as to what behavior is and is not expected of them. Moreover, in this particular case, given Dr. Mahmoodian's history as far back as 1974 of seven other "corrective actions" by the medical staff for similarly disruptive behavior, his assertion that he did not know what constituted such behavior is implausible.

### B. *Disruptive Conduct as Ground for Revocation*

■ In making medical staffing decisions a private or a public hospital may consider factors in addition to technical medical skills or medical competence. *Schlein v. Milford Hospital,* 423 F.Supp. 541, 544 (D.Conn.1976), *aff'd on other grounds,* 561 F.2d 427 (2d Cir.1977); *Huffaker v. Bailey,* 273 Or. 273, 277, 540 P.2d 1398, 1400 (1975). In fact, a hospital may establish, and a court should sustain, a standard for granting or maintaining medical staff appointment or clinical privileges if that standard is rationally related to the delivery of quality health care to patients as a whole. *Nanavati v. Burdette Tomlin Memorial Hospital,* 107 N.J. 240, 249, 526 A.2d 697, 701 (1987). Thus, a hospital has the right, indeed the duty, to ensure that those persons who are appointed to its medical staff meet certain standards of professional competence *and professional*

*conduct,* so long as there is a reasonable nexus between those standards and the hospital's mission of providing overall quality patient care. This point was stated in the following manner in *Miller v. Eisenhower Medical Center,* 27 Cal.3d 614, 614 P.2d 258, 166 Cal.Rptr. 826 (1980) (en banc):

> [T]he providing of high quality patient care is, quite properly, the primary concern of all hospital institutions. The governing authority bears the responsibility for assuring that this goal is achieved to the greatest extent possible, and its decisions relating to medical staff must take into account all factors which have a legitimate relationship to it.... [A]n applicant's [or a medical staff member's] ability to work with other medical personnel in the hospital setting may ... have a clear effect on the level of patient care provided.

27 Cal.3d at 628–29, 614 P.2d at 267, 166 Cal.Rptr. at 835.

The importance of professional conduct, as well as professional competence, is also shown by the fact that regulations of the State Division of Health of the State Department of Health and Human Resources provide that the medical staff shall be accountable to the hospital's governing body for the quality of medical care which is provided to hospital patients *and for the ethical and professional conduct* of its members while functioning in the hospital. Thus, the members of the hospital's medical staff must be legally, professionally and ethically qualified. 5 *W.Va.Code of State Rules* §§ 64–12–14.1.1, 64–12–14.1.-1(c)(3) (1987). In this regard the ethical standards established by the American College of Obstetricians and Gynecologists, of which Dr. Mahmoodian is a member, advise a member not to "use opportunities arising out of contact with patients, colleagues, or the general public for self-aggrandizement or for demeaning the reputation of a colleague."

■ As a specific type of unprofessional conduct, behavior "disruptive to the operations of the hospital" or, stated another way, an inability to work with other health care personnel at the hospital, is a matter

of legitimate concern to a hospital in making medical staffing decisions. Consequently, virtually all of the courts addressing the issue have held, and this Court hereby holds, that a hospital may adopt and enforce a medical staff bylaw providing that the disruptive conduct of a physician, in the sense of his or her inability to work in harmony with other health care personnel at the hospital, is a ground for denying, suspending, restricting, refusing to renew or revoking the staff appointment or clinical privileges of the offending physician, when such inability may have an adverse impact upon overall patient care at the hospital. *See, e.g., Lipsett v. University of Puerto Rico,* 637 F.Supp. 789, 809 (D.P.R. 1986), *rev'd on other grounds,* 864 F.2d 881 (1st Cir.1988); *Robbins v. Ong,* 452 F.Supp. 110, 115 (S.D.Ga.1978); *Schlein v. Milford Hospital,* 423 F.Supp. 541, 544 (D.Conn.1976), *aff'd on other grounds,* 561 F.2d 427 (2d Cir.1977); *Shulman v. Washington Hospital Center,* 222 F.Supp. 59, 64 (D.D.C.1963); *McMillan v. Anchorage Community Hospital,* 646 P.2d 857, 865, 867 & n. 13 (Alaska 1982); *Miller v. Eisenhower Medical Center,* 27 Cal.3d 614, 628–29, 614 P.2d 258, 267, 166 Cal.Rptr. 826, 835 (1980) (en banc); *Even v. Longmont United Hospital Association,* 629 P.2d 1100, 1103 (Colo.Ct.App.1981); *Silver v. Castle Memorial Hospital,* 53 Haw. 475, 479, 497 P.2d 564, 568, *cert. denied,* 409 U.S. 1048, 93 S.Ct. 517, 34 L.Ed.2d 500 (1972); *Ladenheim v. Union County Hospital District,* 76 Ill.App.3d 90, 98, 31 Ill. Dec. 568, 574, 394 N.E.2d 770, 776 (1979); *Yarnell v. Sisters of St. Francis Health Services, Inc.,* 446 N.E.2d 359, 363 (Ind.Ct. App.1983); *Bricker v. Sceva Speare Memorial Hospital,* 111 N.H. 276, 280–81, 281 A.2d 589, 592–93, *cert. denied,* 404 U.S. 995, 92 S.Ct. 535, 30 L.Ed.2d 547 (1971); *Nanavati v. Burdette Tomlin Memorial Hospital,* 107 N.J. 240, 252–55, 526 A.2d 697, 703–05 (1987); *Van Campen v. Olean General Hospital,* 210 A.D. 204, 208, 205 N.Y.S. 554, 556–57 (1924), *aff'd mem.,* 239 N.Y. 615, 147 N.E. 219 (1925); *Straube v. Emanuel Lutheran Charity Board,* 287 Or. 375, 384, 600 P.2d 381, 387 (1979) (en banc), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1657, 64 L.Ed.2d 242 (1980); *Huffaker v. Bailey,* 273 Or. 273, 278–79, 540 P.2d 1398, 1400–01 (1975); *Hagan v. Osteopathic General Hospital,* 102 R.I. 717, 726, 232 A.2d 596, 601 (1967). *See generally* Springer & Casale, *Hospitals and the Disruptive Health Care Practitioner—Is the Inability to Work with Others Enough to Warrant Exclusion?,* 24 Duq.L.Rev. 377 (1985) (answering that question in the affirmative).

Several of these courts have emphasized that one of the principal reasons for upholding a "disruptive conduct" bylaw of a hospital's medical staff is that quality patient care in a hospital setting requires "team work" and compatibility between physicians, nurses and other health care personnel.[15]

---

**15.** A disruptive health care practitioner has been defined as follows:

> The disruptive practitioner is by definition, contentious, threatening, unreachable, insulting and frequently litigious. He will not, or cannot, play by the rules, nor is he able to relate to or work well with others.... This practitioner often falls within the classification of the impaired or sick physician, in that the underlying reason for the practitioner's abusive conduct may be a mental or emotional problem. However, that is not always the case. Sometimes the person is simply a disruptive or abrasive human being.
>
> The manifestation of disruptive behavior sometimes takes bizarre forms. The disruptive practitioner is often clinically competent. Indeed, he will believe himself to be more competent than others on the medical staff. It is not uncommon to find that a disruptive practitioner is, in fact, highly intelligent, clinically superior, even medically outstanding. However, the reason for his disruptiveness, his inability to get along with others, sometimes affects his clinical judgment. He is totally convinced that he is right. Those who would question him or seek to have him behave differently, whether they are colleagues or not, are seen to be motivated by ignorance, stupidity, jealousy or a desire to destroy him as an economic competitor. They are also believed to be weak and vulnerable. In fact, the objects of his unacceptable behavior are most frequently those who, by virtue of their positions, are weak and vulnerable. He may not openly take on the strong and prestigious, but rather seek to undermine and intimidate those who can neither avoid him nor fight back. For these reasons, and regardless of what may cause him to act as he does, he is a formidable person.

As stated in the *Miller* opinion, cited above, the California courts have required a showing of a "substantial" and "specific" threat to patient care as a component of disruptive conduct of a physician justifying a hospital's action adversely affecting that physician's medical staff appointment or clinical privileges. Similarly, as stated in the *Nanavati* opinion, cited above, the New Jersey courts have required a showing that the physician's disruptive conduct "probably" will have an adverse impact on patient care.

Virtually all of the other courts, however, which have specified the degree of likelihood that overall patient care will be threatened have upheld the right of a hospital to act whenever the physician's disruptive conduct, in the expert opinion of the hospital authorities, "may" or "could" affect adversely overall patient care. This majority view is consistent with the Federal Health Care Quality Improvement Act of 1986, which addresses peer review activity based upon the competence or professional conduct of a physician which "affects or could affect adversely the health or welfare of a patient or patients[.]" 42 *U.S.C.* § 11151(9) (1988). We believe the formulation of most courts is reasonable, although we do observe that the potential effect on patient care may not be presumed but must be shown by the evidence. As even the New Jersey courts have recognized, though, a hospital need not wait for a disruptive physician to harm a patient before revoking a medical staff member's privileges. *Nanavati*, 107 N.J. at 254, 526 A.2d at 704.

The mere fact that a physician is irascible, however, or that he or she generally annoys other physicians, nurses or administrators does not constitute sufficient cause for termination of his or her hospital privileges. Likewise, a physician should not be removed from medical staff membership merely because he or she has criticized hospital practices or other health care personnel at the hospital. On the other hand, a physician may be so disruptive as to throw the hospital, or a segment of it, into turmoil and to prevent it from functioning effectively. So substantial a disruption reasonably could lead the hospital authorities to find that overall patient care may be threatened, thereby constituting good cause for termination of the physician's hospital privileges.

 In the present case the pertinent bylaws are quoted at the outset of section III.A. of this opinion, *supra*. Section 3.02 of UHC's medical staff bylaws explicitly links (1) the ability to work with others and (2) its effect on patient care at the hospital. Reading section 7.01 of the bylaws in the same fashion, that is, as requiring a showing that the professional conduct is so "disruptive to the operations of the hospital" that it may have an adverse impact upon overall patient care at the hospital, this Court concludes that these two bylaws are substantively reasonable.

### C. *Sufficiency of the Evidence*

Dr. Mahmoodian finally argues that there was insufficient evidence to support UHC's decision to revoke his staff appointment privileges.

While some courts refuse to review the sufficiency of the evidence to support a private hospital's decision adversely affect-

---

... Only when personal idiosyncrasies, as expressed in words or deeds, begin to affect the ability of others to get their jobs done, or impinge on their right to go about their own business free of burdensome harassment, or when such idiosyncrasies begin to interfere with the practitioner's ability to perform well professionally, is action by the hospital indicated.

Springer & Casale, *Hospitals and the Disruptive Health Care Practitioner—Is the Inability to Work with Others Enough to Warrant Exclusion?*, 24 Duq.L.Rev. 377, 383–85 (1985) (footnotes omitted).

On the record before us, this description of disruptive conduct aptly specifies Dr. Mahmoodian's continuously vituperative and uncooperative behavior. At the root of his constant harassment of colleagues, registered nurses and patients at the hospital is the deep-seated animosity between Dr. Mahmoodian and another obstetrician/gynecologist on UHC's medical staff, Dr. Rahimian. The conduct of the latter has been investigated by the medical staff on a few occasions, too.

ing a medical staff member's hospital privileges, *see, e.g., Pepple v. Parkview Memorial Hospital, Inc.,* 536 N.E.2d 274, 276 (Ind.1989), and while the expertise of the medical peers and the discretion of the governing body of a private (or a public) hospital with respect to medical staffing decisions are entitled to judicial deference, an *inherent* element of "fair hearing procedures" is a requirement of sufficient evidence to support the hospital's decision, a matter to be determined by a court in a proceeding seeking injunctive or declaratory relief.

Other courts have stated in various terms the amount of evidence necessary upon judicial review to support a private hospital's decision affecting adversely a medical staff member's hospital privileges. *See, e.g., Even v. Longmont United Hospital Association,* 629 P.2d 1100, 1103 (Colo. Ct.App.1981) ("findings of the board were supported by competent evidence, and are binding on review"); *Straube v. Emanuel Lutheran Charity Board,* 287 Or. 375, 384, 600 P.2d 381, 386 (1979) (en banc) ("evidence from which it could be found that [physician's] conduct posed a threat to patient care"), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1657, 64 L.Ed.2d 242 (1980). Regardless of the phraseology of these courts, the prevailing standard for judicial review of the findings of a private hospital in these decisions affecting medical staff members' privileges appears to be either an arbitrary and capricious (or abuse of discretion) standard or a substantial evidence standard.

■ Consistent with these authorities, this Court holds that the decision of a private hospital revoking or otherwise affecting adversely the staff appointment or clinical privileges of a medical staff member will be sustained when, as an element of fair hearing procedures, there is substantial evidence supporting that decision. For a definition of "substantial evidence" for purposes of judicial review see *West Virginia Institute of Technology v. West Virginia Human Rights Commission,* 181 W.Va. 525, 532–533, 383 S.E.2d 490, 497–98 (1989).

Some of the more egregious incidents supporting the hospital's decision in this case include the following.

■ Dr. Mahmoodian interfered with a lymph node biopsy being performed by his archrival, another obstetrician/gynecologist, Dr. Rahimian. When Dr. Mahmoodian thought he had discovered evidence that Dr. Rahimian was performing a surgical procedure for which he was not privileged, he (Dr. Mahmoodian) strode into the operating room suite and demanded that a nurse, who was the operating room coordinator, stop Dr. Rahimian's surgery. Dr. Mahmoodian did not follow the appropriate procedure of complaining before the surgery to the chief of surgery or to the chief of the medical staff. Dr. Mahmoodian waited until the case was in progress before demanding of the nurse that the procedure be stopped. The danger to patient care is obvious.

In the case of a patient named Virginia Edgell, one of the hospital's family practice residents called Dr. Mahmoodian at 1:30 a.m. and requested a caesarean section evaluation on this patient, who had been in labor for fifteen to sixteen hours and had had no progress for about eight hours. Dr. Mahmoodian did not come to the hospital to see the patient but advised that the patient could wait until morning. The physician supervising the family practice residents suggested that it was reasonable to obtain a second opinion. Dr. Rahimian was consulted, came to the hospital, evaluated the patient and performed a caesarean section. The next morning, when Dr. Mahmoodian learned that Dr. Rahimian had done a caesarean section on the patient, he (Dr. Mahmoodian) wrote a consultation note in the chart, the accuracy of which the family practice resident disputed. In the note Dr. Mahmoodian stated that he had told the resident he would come to the hospital in the morning and do a section, or, if the resident wanted him before then, he could call and Dr. Mahmoodian would come in. The resident testified that Dr. Mahmoodian had told him not to call back unless a problem developed with the fetal heart monitor and that the patient could wait

until morning. Dr. Mahmoodian's actions in this case prompted the chief of the medical staff to warn Dr. Mahmoodian in writing to come to the hospital to evaluate patients when called by a resident. Again, the threat to patient care is obvious.

The obstetrical department nurse manager testified that Dr. Mahmoodian refused to give verbal orders to the registered nurses with whom he was feuding. Instead, he would give such orders to licensed practical nurses only, who, as he knew, were not authorized under hospital policy to accept verbal orders from a physician. That practice made it necessary for a registered nurse to whom he would speak to call back to Dr. Mahmoodian to receive formally the order. The impact of this circuity was that orders were delayed and quality patient care was implicated.

The record also documents the loss of at least one obstetrician/gynecologist candidate recruited by the hospital, due to Dr. Mahmoodian's behavior and remarks. This fact evinces the threat Dr. Mahmoodian represents to the continued viability of this critical health service at UHC.

The record is replete with other evidence supporting the hospital's decision to revoke Dr. Mahmoodian's staff appointment privileges. In short, there was substantial evidence supporting that decision. Such decision was reached reluctantly by the hospital, but the record establishes that this drastic action was based upon the informed recommendation of the medical peers after fair hearing procedures and was within the sound discretion of the hospital.[16]

Accordingly, this Court reverses the final order of the Circuit Court of Harrison County granting Dr. Mahmoodian's request for a permanent injunction against the hospital's revocation of his medical staff appointment privileges.

Reversed.

---

**16.** We do not address the issue raised by the *amicus* brief of the West Virginia Association of Nurse Anesthetists and the West Virginia Psychological Association. That issue involves the scope of judicial review of a private hospital's decision denying initial staff appointments to individuals who are not allopathic (conventional) physicians.