**Richard J. STERNBERG, M.D., Plaintiff Below, Appellant,**

v.

**NANTICOKE MEMORIAL HOSPITAL, INC., Daniel J. Werner, John Appiott, D.O., Angel Alicea, M.D., Harry Anthony, M.D., Christopher Roberts, M.D., Joseph Karnish, D.O., Victor DeJesus, M.D., Louis F. Owens, Jr., M.D., Richard Simons, D.O., Judith Tobin, M.D., James Rupp, M.D., Thomas Benz, M.D., Marie Wolfgang, M.D., and Stephen Carey, M.D., Defendants Below, Appellees.**

### No. 47, 2010.

Supreme Court of Delaware.

Submitted: Feb. 2, 2011.

Decided: March 15, 2011.

Reargument Denied April 7, 2011.

Daniel F. Wolcott, Jr., Esquire and Sarah E. DiLuzio, Esquire, of Potter Anderson & Corroon LLP, Wilmington, Delaware. Of Counsel: Kevin E. Raphael, Esquire (argued) and Christopher A. Iacono, Esquire, of Pietragallo Gordon Alfano Bosick & Raspanti, LLP, Philadelphia, Pennsylvania, for Appellant.

David R. Hackett, Esquire (argued), of Griffin & Hackett, P.A., Georgetown, Delaware, for Appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

BERGER, Justice:

This appeal addresses the immunity granted to doctors and other health care providers under the federal Health Care Quality Improvement Act of 1986[1] (HCQIA) and a related state statute, the Delaware Peer Review Act[2]. Appellant, an orthopedic surgeon, challenges a precautionary suspension imposed by the Medical Executive Committee (MEC) of Nanticoke Memorial Hospital. To be valid under federal law, such a suspension must be based on a reasonable belief that "the failure to take such action may result in an imminent danger to the health of any individual."[3]

The Delaware statute grants immunity to doctors and other health care professionals as long as they act in good faith without gross or wanton negligence. Both laws apply a presumption in favor of the peer reviewers.

The trial court reviewed the evidence and concluded that no reasonable jury could find in favor of the doctor under either statute. In addition, the trial court decided that the doctor's claims were brought in bad faith. As a result, it awarded attorneys' fees to appellees. We affirm the court's decision on the merits, but find that the record does not support an award of attorneys' fees.

## FACTUAL AND PROCEDURAL BACKGROUND

Dr. Richard J. Sternberg, an orthopedic surgeon, was on the medical staff at the Nanticoke Memorial Hospital from December 1999 through February 2008. He was critical of hospital practices and frequently spoke out about quality of care issues that were not being addressed. The manner in which he expressed his views, however, and his general interaction with the staff, was problematic. Based on the list of "Incidents of Disruptive or Unacceptable Behavior" compiled for this litigation, Sternberg's outbursts began shortly after he arrived at Nanticoke and continued until he was suspended. Nurses, patients, and/or doctors filed complaints every few months. Virtually all of the complaints concerned both his loud and antagonistic manner and his demeaning comments. Nanticoke responded to these complaints by talking to Sternberg about the need to improve his communication skills, requiring him to send letters of apology, and

---

**1.** 42 U.S.C. §§ 11101–11152.

**2.** 24 *Del. C.* § 1768(a).

**3.** 42 U.S.C. § 11112(c)(2).

threatening him with further action if his conduct did not improve.[4]

Throughout his tenure at Nanticoke, Sternberg was being treated for a psychiatric disorder. Early in 2006, Sternberg's doctor advised him and the MEC that, as a necessary accommodation for Sternberg's condition, he must not be assigned any emergency call. This accommodation created problems for the hospital, as it was required to have an orthopedic surgeon available 24/7 in order to maintain its status as a Level 3 trauma facility. Other surgeons were upset that Sternberg did not share in the call responsibilities, and Daniel J. Werner, then President and CEO of Nanticoke, said Sternberg was using his condition as an "excuse" to avoid his call obligations.[5] In any event, Sternberg stopped taking night calls except for his own patients. Unfortunately, his conduct did not improve, and staff members continued to submit reports of Sternberg's disruptive behavior every few months.

Sternberg's conduct on July 12 and July 13, 2006 was deemed so inappropriate that it precipitated two MEC meetings and a recommendation that Sternberg's medical privileges be revoked. The incident on July 12th arose because Sternberg was dissatisfied with the way his cases were being scheduled. After belittling the staff, he barged into, and disrupted, a doctors' meeting by "waving his arms wildly while verbally attacking [a Hospital staff mem-

ber]...."[6] On July 13th, Sternberg was in the operating room, about to perform a procedure, when he learned that necessary instruments were not there. He became very angry and waved the drill he was holding in the air.[7] Dr. Policastro was called to the operating room and tried to calm Sternberg down. Eventually, the proper instruments were brought in and Sternberg completed the surgery.

By letter dated July 26, 2006, Werner advised Sternberg that the Executive Committee was prepared to recommend to the Nanticoke Board that his staff appointment and clinical privileges be revoked. The recommendation was based on his "continuing pattern of disruptive behavior," that "placed patients at risk."[8] The letter repeated an earlier warning that, "any further incident of inappropriate behavior on your part, including, but not limited to, displays of anger, loud tone of voice, or disruption of any kind" will result in immediate suspension.[9] Finally, Werner wrote that Sternberg could take a voluntary leave of absence for the remainder of his term of appointment. Sternberg requested a hearing, as well as a 60 day postponement to allow him to retain an attorney. Werner granted the request, but again warned Sternberg that he would be suspended immediately if he engaged in "any inappropriate behavior...."[10]

---

**4.** When deposed, Sternberg did not remember many of the incidents. As to those he did remember, Sternberg either had a different memory or he attempted to justify his conduct. For example, he said that he spoke loudly, but did not yell at a nurse. He also explained that he used foul language because that was the way everyone spoke.

**5.** Appellees' Appendix, AB–18.

**6.** Affidavit of Michael R. Smith, Esq., A–84, Appendix to Defendants' Opening Brief in Support of its Motion for Summary Judgment

and Defendants' Answering Brief in Opposition to Plaintiff's Motion for Summary Judgment, C.A. No. 07C–10–011 (THG).

**7.** Sternberg agreed that he waved a drill in the air, but noted that he speaks with his hands, and that there was no drill bit in the drill.

**8.** Appellant's Appendix, A–125.

**9.** *Id.* at A–126.

**10.** Appellees' Appendix, AB–41.

Despite the repeated warnings, on October 13, 2006 Sternberg again put his "toes over the line"[11]. By that time, he was running for public office. Sternberg had been told that he could not campaign or wear political buttons in the hospital. Nevertheless, he invited a newspaper reporter, who was covering his campaign, to observe one of his operations. Sternberg obtained written consent from the patient and all necessary hospital staff, but he represented that the visitor's purpose was "educational." The staff provided the reporter with appropriate clothing and instructed her on the use of her mask. As the patient was being prepped for the procedure, someone asked if the visitor was a student. The visitor replied that she was a reporter for a local newspaper. At that point, one of the nurses left the operating room and told a supervisor that the visitor was a reporter. An administrator promptly escorted the reporter out of the operating room and out of the hospital. The surgery proceeded successfully.

There is no evidence that Sternberg became angry, loud, or abusive. Werner's affidavit provides the only evidence of any "disruption" during the incident:

> Ms. Waide [Interim Director of Nurses] also reported that, based upon her discussions with people in the operating room, Dr. Sternberg disrupted the ability of the operating room staff to provide appropriate patient care. Ms. Waide also informed me that at some point after the reporter was removed, Dr. Sternberg walked out of the operating room in his surgical garments to inquire about the location of the reporter and went back in without re-scrubbing.[12]

But appellees' answers to interrogatories contradict the assertions in Werner's affidavit, and the handwritten statements by those in the operating room make no mention of any sort of disruption.

Before the day was over, Sternberg was placed on a "precautionary suspension." Werner's letter stated that, by bringing a reporter into the operating room under false pretenses, Sternberg "disrupt[ed] the ability of the Operating Room staff to provide appropriate patient care and subject[ed] the patient to risk."[13] The letter advised that the reporter's presence in, and later removal from, the operating room created "infection risks." Dr. Thomas Benz, Chief of Surgery, gave a different explanation for Sternberg's suspension:

> Q. And you weren't concerned about him causing any harm in the future to a patient?
>
> A. No, he basically was breaking the rules again.
>
> * * *
>
> Q. Did anyone else in the Medical Executive Committee believe that [Sternberg would cause harm or imminent danger to the health or safety of a patient in the future]?
>
> A. Only that he was being disruptive again, and I can't speak for what they believe ..., but my feeling was he's just continuing the same pattern. I mean you get tired of giving somebody another chance, another chance, another chance, another chance. It's time to pull the trigger.[14]

Without any further investigation of the facts, the MEC voted to continue the precautionary suspension. Again, the doctors on the MEC were not focusing on possible harm to patients or other individuals. The only relevant fact was that Sternberg

---

**11.** Testimony of Dr. Thomas Benz, Appellant's Appendix, A–179.

**12.** Appellees' Appendix, AB–23.

**13.** Appellant's Appendix, A–135.

**14.** Appellant's Appendix, A–179.

broke the rules by misrepresenting the visitor's purpose.

Nanticoke continued to offer Sternberg the option of a leave of absence in lieu of a suspension, and Sternberg ultimately accepted that resolution. On December 7, 2006, the Nanticoke Board voted to reappoint Sternberg, subject to his successful completion of a three day program for physicians who engage in disruptive behavior. Sternberg complied with that condition and returned to work on December 14, 2006. He remained at Nanticoke until he resigned on January 31, 2008.

Shortly before he resigned, Sternberg commenced this action. The complaint alleges, among other things, tortious interference with existing and prospective business relationships; defamation; and breach of the Medical Staff Bylaws. Appellees filed a counterclaim seeking attorneys' fees under the HCQIA. Sternberg filed a motion for summary judgment on the counterclaim and appellees filed a motion for summary judgment based on statutory immunity. The Superior Court denied Sternberg's motion; granted appellees' motion; and awarded them approximately $285,000 in attorneys' fees and costs. This appeal followed.

## DISCUSSION

The Supreme Court of Pennsylvania has succinctly described the purpose and operation of the HCQIA as follows:

> The HCQIA was created by the United States Congress in order to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior. In order to further the candor necessary to such a process, the Congress inserted

immunity provisions in the HCQIA. [They] provide that anyone participating in or aiding a professional review body shall not be held liable in monetary damages for claims arising out of the peer review process. In order to qualify for this immunity, a professional review action must be taken

> (1) in the reasonable belief that the action was in the furtherance of quality health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved ..., and
>
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

The HCQIA further states that a professional review action shall be presumed to have met these four standards. The plaintiff has the burden to overcome this presumption by a preponderance of the evidence.

The "reasonableness" requirements of § 11112(a) create an objective standard, rather than a subjective good faith standard.[15]

If the doctor is suspended without notice or an opportunity to be heard, the HCQIA provides immunity "where the failure to take such an action may result in an imminent danger to the health of any individual."[16]

 This Court reviews the grant of summary judgment *de novo*.[17] Because of the presumption in favor of appellees, however, the standard of review is unusual.

---

**15.** *Manzetti v. Mercy Hospital of Pittsburgh,* 565 Pa. 471, 776 A.2d 938, 945 (2001) (Internal citations and quotations omitted.).

**16.** 42 U.S.C. § 11112(c)(2).

**17.** *Brown v. United Water Delaware, Inc.,* 3 A.3d 272, 275 (Del.2010).

The burden is on Sternberg to produce enough evidence for a reasonable jury to conclude, by a preponderance of the evidence, that appellees' actions failed to meet the standards of the HCQIA.[18] Sternberg contends that he met this burden with respect to two aspects of the HCQIA. He argues that the peer reviewers failed to make a reasonable effort to obtain the facts, and that they lacked a reasonable basis to believe that there was any possible threat of imminent harm.

With respect to investigating the facts, Sternberg argues that the only undisputed facts known to Werner and the MEC when they suspended him were that he brought a reporter into the operating room to observe, and that he stated the visitor's purpose was educational. The reporter caused no disruption—she was dressed properly and left the operating room without incident. Although Werner's letter made reference to disruption and infection risks, he had no basis to believe either statement. The MEC voted to continue the suspension without any additional investigation. Moreover, the MEC doctors did not believe that Sternberg's conduct presented a risk of imminent danger.

Sternberg's argument might have merit if the reporter incident were viewed in isolation. Considered in a vacuum, the failure to determine whether the reporter actually interfered with the progress of the surgery, or otherwise created a risk of harm, could suggest a less than reasonable investigation of the facts. But, as the MEC doctors candidly explained, the suspension was not based on a risk of harm

from that one incident. It was based on Sternberg's continued inability or unwillingness to obey the hospital's rules or control his behavior despite repeated warnings and threats. The investigation of the reporter incident was reasonable because the only relevant facts were: 1) Sternberg was told that he could not engage in any political activity at the hospital; 2) he misleadingly described the visitor's purpose as "educational;" and 3) the reporter was there to write about Sternberg's political campaign.

Sternberg's "imminent danger" argument presents a more difficult question. As he notes, most interim suspensions are imposed because the doctor is incompetent; exercises poor medical judgment; or is impaired because of substance abuse. The fact patterns in those cases readily provide the basis for a concern that the doctor may cause imminent danger.[19] Here, by contrast, it is undisputed that Sternberg is a competent orthopedist and that he has never actually harmed anyone, despite all of his outbursts. Moreover, the reporter incident, for which he was suspended, was not nearly as disruptive, or potentially dangerous, as the July incident (where Sternberg was enraged, and waved a drill in his hand) for which he was not suspended. In sum, Sternberg argues that neither Werner nor the MEC had a reasonable basis to believe that his conduct could be an imminent danger to someone's health. Sternberg claims that, if he is not entitled to judgment as a matter of law, at least there is sufficient evidence for a rea-

---

18. *Sugarbaker v. SSM Health Care,* 190 F.3d 905, 912 (8th Cir.1999).

19. *See, e.g.: Schindler v. Marshfield Clinic,* 2006 WL 2944703 at *13 (W.D.Wis.) (Surgical instrument slipped and rendered patient a quadriplegic for some period of time.); *Sugarbaker v. SSM Health Care,* 190 F.3d 905, 908 (Surgeon's patients suffered excessive blood loss; some surgeries were excessively long; questionable use of antibiotics.); *Poliner v. Texas Health Systems,* 537 F.3d 368, 383 (5th Cir.2008) (Substandard care found in half of doctor's cases); *Brader v. Allegheny General Hospital,* 167 F.3d 832, 840–41 (3rd Cir.1999) (Surgeon "exercised poor judgment repeatedly in surgical, teaching, and personal interactions.").

sonable jury to conclude that appellees are not entitled to immunity under the HCQIA.

The problem with Sternberg's argument is that it does not take into account his long history of disruptive behavior and the circumstances leading up to the suspension. Sternberg has not presented evidence to rebut the written statements and consistent deposition testimony recounting his unprofessional behavior—he yelled at staff members and other doctors, demeaned patients, kicked doors, threw charts, and generally overreacted to problems that arise in any hospital, such as scheduling conflicts and mistakes in providing operating room supplies. By the time he brought the reporter in to observe, Sternberg knew that the MEC was recommending that his staff appointment and hospital privileges be revoked. Werner could not have been clearer in warning Sternberg that any additional incidents of disruptive behavior would result in immediate suspension.

It is against this much larger backdrop that Werner and the MEC evaluated the reporter incident. Sternberg knew that he was not allowed to engage in political activities in the hospital, but he disregarded that prohibition by bringing a reporter into an operating room under false pretenses. These facts, without more, may not provide a reasonable basis to conclude that anyone was at risk of harm during that operation. But it is entirely reasonable to conclude that a doctor (a) with a long history of outbursts and uncontrolled anger; (b) who flouts the hospital's rules in an operating room setting; (c) knowing that he is under a "zero tolerance" directive; is engaging in self-destructive be-

havior. Werner and the MEC did not have to wait until that self-destructive behavior resulted in actual harm.[20] Based on his most recent conduct, it was reasonable to believe that Sternberg was uncontrollable and, therefore, presented a threat of harm to patients or staff.

The Superior Court also held that the individual appellees are immune from suit under the Delaware Medical Peer Review Statute, which provides:

> [Members of boards, committees or peer review bodies] whose function is the review of ... medical care, and physicians' work, with a view to the quality of care and utilization of a hospital ... are immune from claim, suit, liability, damages, or any other recourse, civil or criminal, arising from any act, omission, proceeding, ... or determination ... so long as the person acted in good faith and without gross or wanton negligence ... with good faith being presumed until proven otherwise, and gross or wanton negligence required to be shown by the complainant.[21]

Sternberg argues that the record facts create a jury question as to whether appellees acted in good faith, without gross or wanton negligence. He points to the evidence that neither Werner nor the MEC believed that the reporter incident posed a threat of imminent injury. For the reasons discussed earlier, we find no merit to this argument.

■ Finally, Sternberg contends that the trial court abused its discretion in awarding attorneys' fees. The HCQIA authorizes an award of attorneys' fees to defendants who substantially prevail, "if the claim, or the claimant's conduct during

---

**20.** *Fobbs v. Holy Cross Health Sys. Corp.*, 29 F.3d 1439, 1443 (9th Cir.1994), *cert. denied,* 513 U.S. 1127, 115 S.Ct. 936, 130 L.Ed.2d 881 (1995) ("The [HCQIA] does not require imminent danger to exist before a summary restrain is imposed. It only requires that the danger *may* result if the restraint is not imposed.").

**21.** 24 *Del. C.* § 1768(a).

the litigation ... was frivolous, unreasonable, without foundation, or in bad faith."[22] The trial court found that Sternberg's claims were unreasonable and brought in bad faith. The trial court found it unreasonable for Sternberg to argue that disruptive behavior, without more, could not satisfy the "imminent danger" standard. In addition, the court found bad faith because Sternberg's suspension was converted to a leave of absence. As the court viewed it, after Sternberg received the benefit of not being listed as a doctor who had been suspended, he had no good faith reason to sue.

We conclude that neither of the court's findings is supported factually. A careful analysis of the case law reveals that Sternberg's legal position was not unreasonable. Numerous decisions recognize that "disruptive behavior" is sufficient to restrict or revoke a doctor's hospital privileges.[23] But those cases do not involve summary suspensions. Disruptive behavior in the context of a summary suspension generally involves a form of disruption that directly impacts health care. For example, in *Jenkins v. Methodist Hospitals of Dallas, Inc.*,[24] the doctor regularly berated the staff, made demeaning comments and threatened the staff that they would lose their jobs. But the fact that the doctor had created a hostile environment was not the only consideration. The review committee also had evidence that the doctor was instructing his staff to change the contrast counts in the cath lab, and was "purposely setting up the staff to make mistakes, without regard to patient safety...."[25] Similarly, in *Straznicky v. Desert Springs Hospital*,[26] the doctor's disruptive behavior involved taking a lead shield from an operating room while another doctor, who needed the shield, was performing an operation. The court noted the obvious—that "[t]he removal of protective equipment ... constitutes conduct placing someone in imminent harm."[27] In short, although he did not prevail on the merits, Sternberg's legal argument was not so unmeritorious as to be unreasonable.

■ As for the finding of bad faith, Sternberg alleged that people in the community knew that he had been suspended, and that his practice suffered as a result. Sternberg never signed a release, and appellees did not press any claim that he was precluded from bringing this action because his suspension was withdrawn. In sum, Sternberg refuted the only fact supporting a finding of bad faith. He claimed to have suffered damages, and appellees point to nothing in the record to contradict him. Thus, we conclude that the trial court abused its discretion in awarding attorneys' fees to appellees.

## CONCLUSION

Based on the foregoing, the entry of summary judgment in favor of appellees is AFFIRMED on the issue of immunity, but the award of attorneys' fees to appellees is REVERSED. This matter is remanded to the Superior Court for further action in accordance with this opinion. Jurisdiction is not retained.

---

**22.** 42 U.S.C. § 11113.

**23.** *See, e.g.: Bryan v. James E. Holmes Regional Medical Center,* 33 F.3d 1318 (11th Cir. 1994); *Freilich v. Upper Chesapeake Health, Inc.,* 313 F.3d 205 (4th Cir.2002); *Doctor's Med. Clinic v. City of Jackson,* 569 N.W.2d 231 (Minn.Ct.App.1997) *aff'd in relevant part,* 581 N.W.2d 30 (Minn.1998); *Gordon v. Lewistown Hospital,* 423 F.3d 184 (3rd Cir.2005); *Mahmoodian v. United Hospital Center, Inc.,* 185 W.Va. 59, 404 S.E.2d 750 (1991); *Yashon v. Hunt,* 825 F.2d 1016 (6th Cir.1987).

**24.** 2004 WL 3393380 (N.D.Tex.).

**25.** *Id.* at *19.

**26.** 642 F.Supp.2d 1238 (D.Nev.2009).

**27.** *Id.* at 1247.