87 P.3d 934

**Steven J. MILLER, Plaintiff–Appellant,**

v.

**ST. ALPHONSUS REGIONAL MEDICAL CENTER, INC., a non-profit corporation and John Does 1–20, Defendants–Respondents.**

No. 28639.

Supreme Court of Idaho, Boise, December 2003 Term.

Feb. 6, 2004.

Rehearing Denied April 6, 2004.

Jim Jones & Associates, Boise, for appellant. Jim Jones argued.

Givens Pursley, LLP, Boise, for respondent. Patrick J. Miller argued.

EISMANN, Justice.

This is an appeal by a physician from a judgment entered by the district court after a court trial dismissing a complaint seeking to force the defendant hospital to grant the physician medical staff privileges and from the award of attorney fees to the hospital under Idaho Code § 12–120(3). We affirm the judgment of the district court and award attorney fees on appeal.

## I. FACTS AND PROCEDURAL HISTORY

On February 28, 1999, the plaintiff-appellant Stephen J. Miller (Dr. Miller) applied for medical staff privileges at the defendant-respondent St. Alphonsus Regional Medical Center, Inc., (Hospital), a private hospital located in Boise, Idaho, and licensed by the state of Idaho. Staff privileges permit a physician to provide medical or other patient care services in the Hospital. At the time he applied, Dr. Miller was licensed to practice medicine in the states of Washington, Alaska, Mississippi, and Idaho; he was board certified by the American Board of Surgery; he was a fellow with the American College of Surgeons; and he had been previously grant-

ed privileges at hospitals located in all states in which he was licensed to practice medicine.

The Hospital has delegated to its medical staff the authority and responsibility, among other things, of making recommendations to the Hospital's Board of Trustees (Board) concerning an application for medical staff privileges. To provide a framework to govern the functioning of the medical staff, the Board adopted "Bylaws of the Medical Staff of Saint Alphonsus Regional Medical Center" (Bylaws). Pursuant to the Bylaws, the Chair of the Surgery Department conducted an initial investigation and recommended that Dr. Miller should be granted temporary staff privileges. Effective May 13, 1999, the Hospital granted him temporary privileges "until processed through appropriate committees and final Board recommendation or 90 days whichever occurred first consistent with med. staff bylaws."

The Credentials Committee, chaired by Dr. Adcox, then began its review of Dr. Miller's application. Consistent with the Bylaws, Dr. Miller's name was posted in the doctors' lounge so that other members of the Hospital's medical staff would have an opportunity to submit written information bearing upon his application for privileges. A number of physicians contacted Dr. Adcox and advised him to carefully consider Dr. Miller's application for privileges. As a result of those contacts, Dr. Adcox made a number of telephone calls between May 18 and 24, 1999, to physicians who had previously worked with Dr. Miller. Because of negative information received in these telephone conversations, Dr. Adcox relayed the information to Sandra Bruce, the Hospital's President and CEO. She telephoned hospital administrators in Washington and Mississippi, which confirmed the substance of information obtained by Dr. Adcox. Dr. Miller was technically competent, but he was unable to work collegially with others, he was critical of others, and he exhibited serious, repeated behavioral problems in his interactions with support staff. Based upon that information, the Hospital terminated Dr. Miller's temporary privileges by letter dated May 28, 1999, which was signed by Ms. Bruce and Dr. Adcox.

The Credentials Committee met on May 26, 1999, to discuss Dr. Miller's application for privileges. As a result of various concerns, the Committee asked Dr. Adcox to conduct further investigation into the matter. The Committee met again on July 8, 1999, and during that meeting Ms. Bruce shared the information she had received during her telephone conversations with the two hospital administrators. On July 15, 1999, the Committee met with Dr. Miller. Prior to that meeting, Dr. Adcox prepared a written summary of information he had gathered in the telephone calls he had made in May. That summary omitted favorable information from those telephone calls, and some of the negative information reported in the summary was inaccurate. Dr. Adcox testified that because doctors are used to charting by exception, he included in the summary only the unexpected unfavorable information and omitted the expected favorable information. On July 21, 1999, the Credentials Committee issued a report to the Hospital's Medical Executive Committee recommending that Dr. Miller's application for privileges be denied.

Under the Bylaws, the Medical Executive Committee was required to make a recommendation to the Board, after reviewing the report from the Credentials Committee, the application for privileges, and any other related documentation or relevant information. The Medical Executive Committee could also conduct a personal interview of the applicant if it so desired. In this case, the Medical Executive Committee elected not to interview Dr. Miller, and, after considering the matter, it recommended against granting him staff privileges. Ms. Bruce gave Dr. Miller written notification of the Committee's recommendation by letter dated July 26, 1999, to which was attached the Committee's written report. That report merely adopted the report and recommendation of the Credentials Committee, which was also attached.

The Bylaws provided that an applicant could then seek review by an Ad Hoc Review Committee, which would review all prior recommendations and supporting materials and, in its discretion, could also conduct its own investigation and meet with the applicant or

other individuals. It was then to make a recommendation to the Medical Executive Committee. Dr. Miller timely requested that his application be reviewed by an Ad Hoc Review Committee. The Medical Executive Committee appointed an Ad Hoc Committee consisting of four physicians, none of whom were surgeons, to review Dr. Miller's application for privileges. Dr. Miller wrote to the chair of the Ad Hoc Committee requesting that he be permitted to meet with it, but that request was denied. After reviewing the documents compiled in connection with Dr. Miller's application, the Ad Hoc Committee on September 23, 1999, recommended to the Medical Executive Committee that Dr. Miller's application for privileges be denied.

On September 27, 1999, the Medical Executive Committee met and voted unanimously, with two abstentions,[1] to adopt the report of the Ad Hoc Committee. By letter dated September 29, 1999, Ms. Bruce gave Dr. Miller written notice of the Medical Executive Committee's recommendation that his application for medical staff privileges be denied. The reason given for that recommendation was the Committee's determination that Dr. Miller had demonstrated disruptive behavior in his prior hospital affiliations and that his inability to get along with others or to rely on others for assistance and advice often resulted in poor surgical judgment and decisions, which the Committee believed had a high potential to disrupt the medical, nursing and support staff and could lead to difficulty in those individuals effectively performing their respective jobs.

The Bylaws provided that if the Medical Executive Committee made a recommendation adverse to an applicant, he or she could request a formal hearing before a panel of at least three persons appointed by the Hospital CEO. The members of the Hearing Panel had to be members of the hospital staff who had not actively participated in the consideration of the matter at any previous level, or physicians or lay people not connected with the Hospital, or any combination of such

persons. Dr. Miller requested a formal hearing, and Ms. Bruce then appointed three retired physicians to serve as the Hearing Panel.

The formal hearing was conducted on January 6, 7, and 27, 2000. The Bylaws provided that the Hearing Panel "shall recommend against the person who requested the hearing unless it finds that said person has proved that the recommendation which prompted the hearing was unreasonable, not sustained by the evidence, or otherwise unfounded." On March 2, 2000, the Hearing Panel issued its report and recommendation that Dr. Miller's application for staff privileges be denied. The Panel summarized its recommendation as follows:

> In four different locations in approximately seven years, the Applicant has repeatedly had significant and perhaps serious problems. There appears to be a consistent inability to evaluate with insight the dynamics of his professional environment. The Panel recognizes and appreciates the positive endorsements from a variety of sources, but these endorsements are not so persuasive as to negate the findings of the Committees. In his relatively short professional life, the Applicant has demonstrated an inability to work cooperatively with others; and the Panel believes there is a likelihood that such inability would cause problems with patient care at St. Alphonsus.

The Hearing Panel's report and recommendation was then sent to the Medical Executive Committee. After reviewing that report, the Medical Executive Committee on March 20, 2000, sent Ms. Bruce a letter stating that it affirmed its initial recommendation that Dr. Miller's application for medical staff membership be denied.

Dr. Miller then timely requested the final appeal provided in the Bylaws—an appeal to an Appellate Review Panel composed of at least three persons appointed by the Chair of the Board. The Bylaws provided that the failure to request such appellate review constituted acceptance of the adverse recom-

---

1. Dr. Adcox and another physician abstained from voting because they had served on the Cre-

dentials Committee.

mendation. Under the Bylaws, the grounds for an appeal were:

   (a) There was substantial failure on the part of the Medical Executive Committee or Hearing Panel to comply with the Hospital or Medical Staff Bylaws in the conduct of hearings and recommendations based on hearings so as to deny due process or a fair hearing; or

   (b) the recommendation was made arbitrarily, capriciously or with prejudice; or

   (c) the recommendation of the Medical Executive Committee or Hearing Panel was not supported by the evidence.

The three-person Appellate Review Panel met on April 25, 2000, to consider the appeal. The next day it issued its report and recommendation denying the appeal.

On May 17, 2000, the Board met to consider the Medical Executive Committee's recommendation that Dr. Miller's application for privileges be denied. After discussing the matter, the Board voted unanimously to accept the recommendations of the Appellate Review Panel and the Medical Executive Committee. As a result, Dr. Miller was denied medical staff privileges at the Hospital.

On May 22, 2000, Dr. Miller filed this action, and two days later he filed an amended complaint seeking: (a) a declaratory ruling that the credentialing proceeding involving him was void; (b) an injunction prohibiting the Hospital from reporting the denial of privileges to the state of Idaho or to a national physician database; and (c) a writ of mandate requiring the Hospital to provide him with temporary staff privileges during the pendency of the litigation and permanent privileges thereafter. He also requested an emergency temporary restraining order and preliminary injunction to prohibit the Hospital from reporting the denial of his request for privileges. After hearing evidence, the district court denied that request on June 1, 2000.

Dr. Miller then filed a motion for injunctive relief or mandamus to require the Hospital to grant him privileges. After an evidentiary hearing, the district court denied his motion for a writ of mandamus on the ground that the Hospital had no clear legal duty to grant the privileges and that Dr. Miller had an adequate remedy at law. The district court also denied the request for injunctive relief. It found that the Bylaws constituted a contract between Dr. Miller and the Hospital, and he was therefore entitled to demand that the Hospital comply with the letter and spirit of the procedure set forth in the Bylaws. The district court also held that it could review the Bylaws to ensure that they afford basic notice and fair hearing procedures, including an impartial tribunal, but it would apply a deferential standard when reviewing the factual basis for the Hospital's decision. It would consider whether there is a factual basis for the Hospital's decision, but not substitute its opinion as to the weight or effect of the evidence. The district court found that the Bylaws provided a fair process for evaluating Dr. Miller's application for privileges, and that he had failed to show that the Hospital's conclusion was without a factual basis or was otherwise arbitrary, capricious, or improperly motivated.

After obtaining leave of the district court, Dr. Miller filed a second amended complaint on April 25, 2001, by which he sought: (a) a declaratory ruling that the credentialing proceeding involving him was void; (b) an injunction requiring the Hospital to grant him privileges and notify the National Practitioner Data Bank of the reversal of its action; and (c) either specific performance of the contract between him and the Hospital or damages for its breach.

The Hospital moved for summary judgment. The district court denied the motion on the ground that both the Bylaws and the contract between Dr. Miller and the Hospital required that the Hospital act in good faith and without malice when considering his application for privileges and that there was a genuine issue of material fact regarding that issue.

This case was then tried to the district court, and, at the end of Dr. Miller's case in chief, the district court orally granted the Hospital's motion for involuntary dismissal. On May 28, 2002, the district court issued its written findings of fact and conclusions of law in support of the granting of the motion.

It found that Dr. Miller had failed to prove, by a preponderance of the evidence, that any particular actor at any stage of the proceedings acted in bad faith or that any decision of any relevant committee was the product of bad faith.

Dr. Miller filed a notice of appeal on June 17, 2002. The Hospital requested court costs and attorney fees, to which Dr. Miller timely objected. On June 26, 2002, judgment was entered dismissing this action with prejudice. On August 6, 2002, the district court issued an order awarding the Hospital $1,469.00 in costs as a matter of right, $2,497.39 in discretionary costs, and $126,725.17 in attorney fees under Idaho Code § 12–120 on the ground that this was an action to recover on a commercial transaction. An amended judgment was entered the same day, and on August 15, 2002, Dr. Miller filed an amended notice of appeal.

## II. ISSUES ON APPEAL

A. Did the district court err by limiting the scope of its review of the hospital's decision denying medical staff privileges to Dr. Miller?

B. Did the procedures set forth in the Bylaws afford Dr. Miller due process?

C. Did the Hospital fail to substantially follow the Bylaws?

D. Did the evidence at the formal hearing support the findings of the Hearing Panel?

E. Did the district court err in refusing to admit evidence?

F. Did the district court err in awarding the Hospital attorney fees under Idaho Code § 12–120(3) on the ground that this was an action to recover on a commercial transaction?

G. Is the Hospital entitled to an award of attorney fees on appeal under Idaho Code § 12–120(3)?

## III. ANALYSIS

**A. Did the District Court Err by Limiting the Scope of Its Review of the Hospital's Decision Denying Medical Staff Privileges to Dr. Miller?**

In its memorandum opinion denying Dr. Miller's motion for injunctive relief or man-damus, the district court stated that it "views its authority to determine the parties' respective rights and duties as originating in contract." The district court relied upon the decision of the West Virginia Supreme Court of Appeals in *Mahmoodian v. United Hospital Center, Inc.,* 185 W.Va. 59, 404 S.E.2d 750, 755 (1991), wherein it stated:

> Utilizing breach of contract principles, most courts explicitly addressing the issue presented here have held, and we hereby hold, that the decision of a private hospital to revoke, suspend, restrict or to refuse to renew the staff appointment or clinical privileges of a medical staff member is subject to limited judicial review to ensure that there was substantial compliance with the hospital's medical staff bylaws governing such a decision, as well as to ensure that the medical staff bylaws afford basic notice and fair hearing procedures, including an impartial tribunal.

The district court concluded that the Bylaws constituted the contract between Dr. Miller and the Hospital. By the time of the hearing on the Hospital's motion for summary judgment, the parties both agreed that a contract was formed when Dr. Miller applied for privileges. In its findings of fact and conclusions of law entered in support of its grant of the Hospital's motion for involuntary dismissal, the district court stated, "The Court holds a contract existed which required Saint Alphonsus to consider Dr. Miller's application in accordance with the Bylaws." The district court held that because every contract contains an implied covenant of good faith, it would examine the evidence to determine whether Dr. Miller had proven the existence of bad faith in the consideration of his application for privileges. The district court concluded "that Dr. Miller has failed to prove, by a preponderance of the evidence, that any particular actor at any stage of the proceedings acted in bad faith, much less that any decision of any relevant committee was the product of bad faith."

Dr. Miller alleges that the district court erred in finding that he had failed to prove bad faith. A trial court's findings of

fact will not be set aside on appeal unless they are clearly erroneous. *Bramwell v. South Rigby Canal Co.,* 136 Idaho 648, 39 P.3d 588 (2001); IDAHO R. CIV. P. 52(a). When deciding whether findings of fact are clearly erroneous, this Court does not substitute its view of the facts for that of the trial court. *Id.* It is the province of the trial court to weigh conflicting evidence and to judge the credibility of witnesses. *Rowley v. Fuhrman,* 133 Idaho 105, 982 P.2d 940 (1999). On appeal, this Court examines the record to see if challenged findings of fact are supported by substantial and competent evidence. *Id.* Evidence is regarded as substantial if a reasonable trier of fact would accept it and rely upon it in determining whether a disputed point of fact has been proven. *Bramwell v. South Rigby Canal Co.,* 136 Idaho 648, 39 P.3d 588 (2001). As explained below, we do not agree that the Bylaws constituted a contract between Dr. Miller and the Hospital. Because the Hospital has not challenged that conclusion on appeal, however, we have reviewed the record to determine whether the district court's findings regarding good faith are supported by substantial and competent evidence. The district court's findings in this regard are not clearly erroneous.

Dr. Miller argues that the district court erred in limiting the scope of its review of the Hospital's decision denying him medical staff privileges. He argues that the district court should not have limited its review to whether or not Dr. Miller had proven bad faith, but it should have treated this as any other action for breach of contract and made findings of fact upon every critical issue, including whether there was a sufficient basis for denying him privileges. The Bylaws provide a list of factors to consider when determining whether to grant staff privileges. They state:

Each recommendation concerning the appointment or reappointment of an Applicant and the Clinical Privileges to be granted for the Applicant, and the determinations made with respect thereto, shall be based upon such Applicant's current competence and clinical judgment in the treatment of patients; his or her professional ethics; his or her education, training and experience; his or her participation in continuing education; his or her meeting of the qualifications for staff status and his or her anticipated ability in or history with respect to fulfilling of the responsibilities of staff status; his or her anticipated and/or historical use of the Hospital facilities; his or her discharge of obligations hereunder; his or her compliance with the Medical Staff Bylaws, Rules and Regulations and hospital and Board policies in this hospital and others where he or she has provided clinical services; his or her cooperation with other members, patients and hospital employees; his or her disruption, if any, of hospital operations; his or her physical health, mental health and emotional stability; and other matters bearing on his or her ability and willingness to contribute to high quality patient care practices in the Hospital including, without limitation, previously successful or currently pending challenges to any professional license or registration or any voluntary relinquishment of such professional license or registration and any voluntary or involuntary termination of Medical Staff privileges or any voluntary or involuntary limitation or reduction or loss of Clinical Privileges at this or another hospital. The basis for privileges determinations to be made in connection with appointments, reappointment, or otherwise shall be uniformly applied to all Applicants and shall include observed clinical performance and the documented results of quality assurance activities conducted at the Hospital or other health care facilities. Clinical Privileges shall also be based on pertinent information concerning clinical performance obtained from staff members, peers and other sources, especially other institutions and health care settings where the Applicant exercises or has exercised Clinical Privileges. This information shall be added to and maintained in the Hospital's file established for a staff member.

According to Dr. Miller, under the contract between him and the Hospital, he was entitled to have his application for privileges judged according to the above criteria. He contends that in his breach of contract action, the district court was required to make find-

ings of fact regarding how Dr. Miller met these criteria.

This Court has never addressed the issue of what is the appropriate standard of judicial review, if any, applicable to the denial of staff privileges by a private hospital.[2] Courts around the country are divided on this issue. The positions range from no judicial review, *Barrows v. Northwestern Mem. Hosp.*, 123 Ill.2d 49, 121 Ill.Dec. 244, 525 N.E.2d 50 (1988); to judicial review of whether the hospital followed the applicable procedures, *Rosenberg v. Holy Redeemer Hosp.*, 351 Pa.Super. 399, 506 A.2d 408 (1986); to judicial review of the applicable procedures to ensure that they afford basic notice and fair hearing procedures, including an impartial tribunal, *Mahmoodian v. United Hosp. Ctr. Inc.*, 185 W.Va. 59, 404 S.E.2d 750 (1991); to judicial review of whether a regulation giving rise to exclusion is arbitrary, capricious and unrelated to any legitimate aim of the hospital, *Reiswig v. St. Joseph's Hosp. and Med. Ctr.*, 130 Ariz. 164, 634 P.2d 976 (Ct.App.1981); to judicial review of whether the denial is founded upon reasonable and sensible grounds and is supported by sufficient reliable evidence to justify the result, *Garrow v. Elizabeth Gen. Hosp. and Dispensary*, 79 N.J. 549, 401 A.2d 533 (1979). Courts have used various rationales in order to justify judicial intervention into the affairs of a private hospital. We believe, however, that the determination of the appropriate standard of judicial review, if any, must begin with the applicable law.

■ The district court concluded, and the parties agreed, that the Bylaws constituted a contract between Dr. Miller and the Hospital. That conclusion was in error. The Hospital's Bylaws did not confer any contractual rights. We agree with the reasoning of the Georgia Court of Appeals in *St. Mary's Hospital of Athens, Inc. v. Radiology Professional Corp.*, 205 Ga.App. 121, 421 S.E.2d 731, 736 (1992) (citations omitted), wherein the court stated:

Our courts have held that because hospitals have the authority to establish and revise rules and regulations governing the appointment of physicians to the hospital staff, medical staff bylaws alone do not create any contractual right to continuation of staff privileges. Indeed, hospitals are entitled to change the staff bylaws or the terms of appointment even if that act results in the termination of a physician's staff privileges. Given that the bylaws themselves confer no contractual rights, we conclude that no cause of action lies against a hospital ex contractu based solely on an alleged breach of bylaw provisions.

The Bylaws merely provided the procedures setting forth how the Hospital would process Dr. Miller's application for medical staff privileges. Dr. Miller's agreement in his application to abide by the Bylaws, and the Bylaws provision stating that by applying for appointment he agreed to be bound by them, did not create a contract between Dr. Miller and the Hospital. We see no need to expand contract law in order to provide a basis for some form of judicial review of applications for medical staff privileges.

There are two provisions of Idaho law that relate to this issue. Idaho Code § 39–1395 provides, insofar as is relevant, as follows:

Except as otherwise provided in this section, no provision or provisions of this section shall in any way change or modify the authority or power of the governing body of any hospital to make such rules, standards or qualifications for medical staff membership as they, in their discretion, may deem necessary or advisable, or to grant or refuse membership on a medical staff.

An applicant for medical staff membership may not be denied membership solely on the ground that the applicant holds a license to practice podiatry issued by the Idaho state board of podiatry. The criteria utilized for granting medical staff membership shall be reasonable and shall not discriminate against podiatry.

---

2. We are dealing here only with a private hospital's denial of medical staff privileges. We express no opinion herein regarding either the appropriate standard for judicial review of a private hospital's decision to revoke or refuse to renew hospital privileges or the appropriate standard for judicial review of a public hospital's decision to deny, revoke, or refuse to renew staff privileges.

The process for considering applications for medical staff membership and privileges shall afford each applicant due process.

All applications for medical staff membership shall be acted upon within one hundred twenty (120) days from the date the required information is submitted.

The title to the legislation adopting § 39–1395 stated that its purpose was "to provide standards for determining staff membership for hospitals." Ch. 134, 1992 Idaho Sess. Laws 421.

The first paragraph of § 39–1395 recognizes the general rule that hospitals have the authority "to make such rules, standards or qualifications for medical staff membership as they, in their discretion, may deem necessary or advisable." The statute limits the hospital's discretion in three areas, however, to prevent discrimination against podiatrists, to require that the process for considering applications afford each applicant due process, and to require that applications be acted upon within one-hundred-twenty days.

The legislature has also given the Idaho Department of Health and Welfare authority to adopt rules, regulations, and standards for the licensing of hospitals. IDAHO CODE § 39–1303a (2002). Pursuant to that authority, the Department has adopted[3] IDAPA 16.03.14.200.01.d which provides:

d. Medical Staff Appointments and Reappointments:

i. A formal written procedure shall be established for appointment to the medical staff;

ii. Medical staff appointments shall include an application for privileges, signature of applicant to abide by hospital bylaws, rules, and regulations, and delineation of privileges recommended by the medical staff. The same procedure shall apply to nonphysician practitioners who are granted clinical privileges.

iii. The procedure for appointment and reappointment to the medical staff shall involve the administrator, medical staff, and the governing body. Reappointments shall be made at least biannually.

iv. The governing body bylaws shall approve medical staff authority to evaluate the professional competence of applicants, appointments and reappointments, curtailment of privileges, and delineation of privileges;

v. Applicants for appointment, reappointment or applicants denied to the medical staff privileges shall be notified in writing;

vi. There shall be a formal appeal and hearing mechanism adopted by the governing body for medical staff applicants who are denied privileges, or whose privileges are reduced.

Thus, Idaho Code § 39–1395 requires hospitals to adopt procedures for considering applications for medical staff membership and privileges that afford each applicant due process. IDAPA 16.03.14.200.01.d requires that those procedures be in writing; that the applicant must agree to abide by hospital bylaws, rules, and regulations; that the procedures involve the hospital administrator, medical staff, and governing body; that the medical staff must have the authority to evaluate applicants; that applicants who are denied privileges must be notified in writing; and that there must be a formal appeal and hearing mechanism for applicants who are denied privileges.

■ Implicit in those mandates is the requirement that the hospital substantially follow whatever procedures it adopts for determining qualifications for medical staff appointment. It would be meaningless to require a hospital to adopt written procedures that afford due process to applicants for medical staff privileges unless the hospitals were also required to substantially comply with the procedures they adopt. Thus, the appropriate standard of judicial review in this case is limited to determining whether the procedures adopted by the Hospital afforded each applicant due process, whether

---

**3.** The Department has also adopted IDAPA 16.03.14.250.01.b, which provides, insofar as is relevant, "The medical staff, with governing body approval, shall develop and implement a written procedure for determining qualifications for medical staff appointment, and for determining privileges."

the procedures included the requirements set forth in IDAPA 16.03.14.200.01.d, and whether the Hospital substantially followed its procedures when considering Dr. Miller's application for staff privileges. The district court did not err by failing to expand the scope of judicial review as asserted by Dr. Miller.

## B. Did the Procedures Set Forth in the Bylaws Afford Dr. Miller Due Process?

■ Idaho Code § 39–1395 mandates that hospitals have a process for considering applications for medical staff membership and privileges that affords each applicant due process. Due process is a flexible concept, *Bradbury v. Idaho Judicial Council*, 136 Idaho 63, 28 P.3d 1006 (2001), and the legislature has not specified what process it considers due in this circumstance. A common definition of procedural due process is the opportunity upon reasonable notice for a fair hearing before an impartial tribunal. See *Id.; Aberdeen–Springfield Canal Co. v. Peiper*, 133 Idaho 82, 982 P.2d 917 (1999); *Yellowstone Pipe Line Co. v. Drummond*, 77 Idaho 36, 287 P.2d 288 (1955); *Abrams v. Jones, Comm'r of Dept. of Law Enforcement*, 35 Idaho 532, 207 P. 724 (1922). Implicit in the requirement of a fair hearing is an understandable standard against which the applicant's qualifications can be judged, *Dupont v. Idaho State Bd. of Land Comm'rs*, 134 Idaho 618, 7 P.3d 1095 (2000), although the specificity required here would not be as great as is required for criminal statutes. Dr. Miller argues that the Bylaws deprived him of due process[4] in several respects.

■ **1. Did the Bylaws provide an understandable standard?** Dr. Miller argues that the Bylaws did not provide a clear, ascertainable standard against which his conduct could be measured. The two standards that he challenges are "his or her cooperation with other members, patients and hospital employees" and "his or her disruption, if any, of hospital operations." He argues that such

standards are too vague unless they are tied to patient care or safety.

These two factors were included in a list ending with the statement, "and other matters bearing on his or her ability and willingness to contribute to high quality patient care practices in the Hospital." This phrase could be read as indicating that the preceding factors were understood as bearing on the applicant's ability and willingness to contribute to high quality patient care practices. The Hospital appears to have so interpreted the two challenged factors.

In its report, the Credentials Committee stated, "The primary concerns are related to disruptive behavior, possible creation of a hostile work environment and concerns that disruptive behavior has interfered with clinical decision making/medical care." When initially recommending that Dr. Miller's application for privileges be denied, the Medical Executive Committee stated, "The primary concerns relate to disruptive behavior, possible creation of a hostile work environment and concerns that the disruptive behavior has interfered with clinical decision making/medical care in the past." Dr. Miller's application was then considered by the Ad Hoc Review Committee, which also linked its negative recommendation to patient care. In its report, it concluded:

> The Committee believes that Dr. Miller has demonstrated disruptive behavior at all prior locations of practice. This included behavior that was contentious, threatening, unreachable, insulting and at times litigious. His inability to get along with others or to rely on others for assistance and advice often resulted in poor surgical judgment and decisions. His behavior has high potential to disrupt the medical, nursing and support staff which could lead to difficulty in these individuals to perform their respective jobs effectively. We believe that his behavior holds a significant threat to patient care at Saint Alphonsus.

Dr. Miller then had a formal hearing before the Hearing Panel. It also linked its adverse

---

4. He bases his due process argument not upon Idaho Code § 39–1395, but upon appellate opinions from other jurisdictions holding that applicants for medical staff privileges must be afforded due process.

recommendation to patient care. It summarized its recommendation as follows:

> In four different locations in approximately seven years, the Applicant has repeatedly had significant and perhaps serious problems. There appears to be a consistent inability to evaluate with insight the dynamics of his professional environment. The Panel recognizes and appreciates the positive endorsements from a variety of sources, but these endorsements are not so persuasive as to negate the findings of the Committees. In his relatively short professional life, the Applicant has demonstrated an inability to work cooperatively with others; and the Panel believes there is a likelihood that such inability would cause problems with patient care at St. Alphonsus.

The Appellate Review Panel then considered the application and recommended that the Board accept the report and recommendation of the Hearing Panel. The Board did so, and made the specific finding that Dr. Miller "failed to demonstrate his ability to work with others; and that the ability to work with others is an important qualification that would likely impact patient care." Thus, throughout the process, the various recommendations to deny Dr. Miller's application for medical staff privileges and the final determination to deny that application were all tied to patient care. He was on notice from the initial recommendation of the Credentials Committee through the various levels of review that the primary issue was the concern that his inability to work cooperatively with others could adversely impact patient care. The challenged factors in the Bylaws for evaluating applications were not so vague as to deny Dr. Miller due process as required by Idaho Code § 39–1395.

**2. Did Dr. Miller have an impartial tribunal?** The Bylaws provide that any member of the medical staff who is appointed to serve on the Hearing Panel cannot have actively participated in the consideration of the matter at any previous level. In compliance with this provision, Ms. Bruce appointed three retired physicians to serve on the Hearing Panel. The Bylaws do not prohibit, however, a physician who is in direct economic competition with an applicant from serving on the Hearing Panel. In this case, however, the three members of the Hearing Panel were all retired, so none of them was an economic competitor of Dr. Miller.

Dr. Miller contends that Dr. Austin Cushman, one of the members of the Credentials Committee, was a general surgeon who was in direct economic competition with Dr. Miller and that he had allegedly made negative comments about Dr. Miller's employer Primary Health, Inc. Dr. Miller alleges that Dr. Cushman, should therefore not have served on the Credentials Committee when Dr. Miller's application for privileges was being considered. The due process hearing to which Dr. Miller was entitled was, under the Bylaws, the hearing before the Hearing Panel. The various levels of review prior to that hearing are not required in order to provide procedural due process. Dr. Miller has not presented any argument or authority supporting the proposition that such other levels of review, if provided, must comport with due process. Under the facts of this case, we need not address that issue. The vote of the Credentials Committee was unanimous, and the district court found that "Dr. Cushman did not express any opinion at any time to the Credentials Committee as to whether Dr. Miller's application for privileges should be granted. Dr. Cushman did not attempt to exert any influence over the Credentials Committee's decision." Thus, even if Dr. Cushman's service on the Credentials Committee violated the statutory right to due process provided by Idaho Code § 39–1395, any such violation was harmless.

Dr. Miller also points out that some members of the Credentials Committee also served on and participated in the decision of the Medical Executive Committee, that a physician who served on the Ad Hoc Review Committee also participated in the final action of the Medical Executive Committee, and that Ms. Bruce provided information to the Credentials Committee and the Board and participated in the meeting of the Medical Executive Committee where it voted to recommend against approving Dr. Miller's request for medical staff privileges. Dr. Miller does not argue, however, that any of this

conduct violated either the procedural due process required by Idaho Code § 39–1395 or the Bylaws.

Dr. Miller also argues that various members of the medical staff who participated in reviewing his request for medical staff privileges were motivated by bias against his employer Primary Health, Inc. The district court found to the contrary, and that finding is supported by substantial and competent evidence.

## C. Did the Hospital Fail to Substantially Follow the Bylaws?

■ **1. Did the Hospital properly consider the various factors listed in the Bylaws as a basis for determining whether or not to grant medical staff privileges?** One of the factors listed in the Bylaws as a basis for determining whether to grant medical staff privileges is the applicant's "current competence and clinical judgment in the treatment of his patients." Another is "pertinent information concerning clinical performance obtained from staff members, peers and other sources." Dr. Miller argues that the Hospital failed to give sufficient weight to these two factors. He also contends that he was not treated equally because he is the first physician to be denied medical staff privileges by the Hospital based upon his inability to work cooperatively with others. The weight to be given the various factors is entirely within the discretion of the Hospital and is not subject to judicial review.

■ **2. Did the Hospital fail to substantially comply with the Bylaws by not providing Dr. Adcox's notes prior to the hearing?** The Bylaws provided that an applicant can request a formal hearing before a Hearing Panel when the Medical Executive Committee recommends against granting him or her medical staff privileges. The Bylaws further provided:

If pertinent, all patient records or information supporting the recommendation shall be identified. This statement may be amended or added to at any time, even during the hearing so long as material is relevant to the continued appointment or Clinical Privileges of the person requesting the hearing, who shall have sufficient time

to study this additional information and rebut it.

By letter dated December 1, 1999, Dr. Miller's counsel requested from the Hospital's counsel, "If any of the hospital's witnesses are going to be giving testimony based on notes of conversations, I think we are entitled to see those notes, as are the hearing panel members." The Hospital's counsel responded by letter dated December 3, 1999, stating:

In response to your December 1, 1999 letter, I do not have any objection to notes of members of the hospital staff being admitted into evidence at the hearing provided that such individual is called to testify and testifies from his or her notes. I do not have copies of such individual's notes nor does the medical staff office. Any such notes (and assuming such notes exist) would be maintained by the individual staff members who took notes. As a result, I would propose to deal with this at the time of the hearing and not try to provide the notes to the hearing panel in advance.

By letter dated December 17, 1999, Dr. Miller's counsel again requested such notes, particularly any made by Dr. Adcox, in order to prepare a response. He stated that Dr. Miller needed to know the source of several allegations in order to respond. By letter dated December 28, 1999, the Hospital's counsel responded, "The notes of individual physicians who participated in telephone interviews are not intended by me to be an exhibit at the hearing. Obviously, to the extent I call a witness who will testify from notes, you will be entitled to review those notes."

■ Dr. Adcox was the first witness called to testify when the formal hearing before the Hearing Panel commenced on January 6, 2000. As chair of the Credentials Committee, he had between May 18 and 24, 1999, telephoned various physicians who had previously worked with Dr. Miller and had made notes of those telephone calls. When he was asked to testify regarding those conversations, he requested permission to review his personal notes. At that point, a copy of the notes was given to Dr. Miller's

counsel. After Dr. Adcox testified to his telephone conversation with one physician, Dr. Miller's counsel objected to anything from the notes because they had not been provided to him prior to the hearing. The hearing officer ruled that Dr. Adcox could use the notes to refresh his memory, but he could not read from them or quote them. That was a discretionary ruling of the hearing officer that is not subject to judicial review.

Dr. Miller also alleges that he could not adequately prepare for the hearing without the notes. He was notified before the hearing of the reason for the denial of his application for privileges and provided with the names of those persons from whom information had been obtained. The Bylaws did not require that the expected testimony of the various witnesses be disclosed prior to the hearing. They only require the exchange of a list of the names and addresses of witnesses that a party intends to call and a list of exhibits that the party intends to introduce at the hearing. The Hospital did not offer Dr. Adcox's notes as an exhibit. The Hospital did not fail to substantially comply with the procedures set forth in the Bylaws.

## D. Did the Evidence at the Formal Hearing Support the Findings of the Hearing Panel?

The Bylaws provided:

The hearing shall not be conducted according to rules of law relating to the examination of witnesses or presentation of evidence. Any relevant evidence shall be admitted by the Presiding Officer if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the admissibility of such evidence in a court of law.

Dr. Miller contends that Dr. Adcox's notes contained many inaccuracies, that they did not include the positive comments made by those Dr. Adcox contacted, and Dr. Adcox accepted without further investigation various negative comments made by two physicians that he contacted. As a result, Dr. Miller contends that no responsible person should have relied upon Dr. Adcox's testimo-

ny. He also argues that some of the findings of the Hearing Panel were not supported by the evidence.

Dr. Miller has not pointed to any provision in the law that permits judicial review of the findings of the Hearing Panel. The admission of evidence is within the sole discretion of the hearing officer, and the Panel's findings are not reviewable by a court.

## E. Did the District Court Err in Refusing to Admit Evidence?

Dr. Miller contends that the district court erred in refusing to admit the transcript of the testimony before the Hearing Panel into evidence for all purposes. He argues that it was relevant, and therefore admissible, even though it was hearsay. The district court was not conducting an appellate review of the decision of the Hearing Panel. It therefore did not err in refusing to admit the transcript into evidence.

Dr. Miller also contends that the district court erred by refusing to permit him to take the depositions of out-of-state physicians who were familiar with his professional behavior. He argues that because the Hospital relied upon unfavorable comments by two out-of-state physicians contacted by Dr. Adcox, he should be permitted to depose other physicians where Dr. Miller practiced in order to show that those two physicians were influenced by bias or prejudice. The district court correctly recognized that it could not substitute its judgment for that of the Hospital regarding whether or not Dr. Miller should be granted medical staff privileges. The deposition testimony of these other physicians was not relevant to any matters to be decided by the district court. It therefore did not err in refusing to permit Dr. Miller to take those depositions.

## F. Did the District Court Err in Awarding the Hospital Attorney Fees Under Idaho Code § 12-120(3) on the Ground that This Was an Action to Recover on a Commercial Transaction?

The district court found that this was an action to recover on a commercial transaction and awarded the Hospital attor-

ney fees pursuant to Idaho Code § 12–120(3) in the sum of $126,725.17. That statute provides:

(3) In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, guaranty, or contract relating to the purchase or sale of goods, wares, merchandise, or services and in any commercial transaction unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney's fee to be set by the court, to be taxed and collected as costs.

The term "commercial transaction" is defined to mean all transactions except transactions for personal or household purposes. The term "party" is defined to mean any person, partnership, corporation, association, private organization, the state of Idaho or political subdivision thereof. In his second amended complaint, Dr. Miller alleged as one count that his application for medical staff privileges created a contract between him and the Hospital and that the Hospital breached that contract. The focus of the trial was whether the Hospital acted in good faith in the performance of its alleged contractual obligations. Although we have held that there was no contract, that does not end the inquiry regarding the Hospital's claim for attorney fees.

■ We have previously held that if a party alleges the existence of a contractual relationship of the type embraced by Idaho Code § 12–120(3), that claim triggers the application of the statute, and the prevailing party is entitled to an award of attorney fees even though no liability under a contract was ultimately established. *Property Mgmt. West, Inc. v. Hunt*, 126 Idaho 897, 894 P.2d 130 (1995); *Magic Lantern Prods., Inc. v. Dolsot*, 126 Idaho 805, 892 P.2d 480 (1995). Likewise, if a party asserts a claim that is based upon the existence of an alleged commercial transaction, attorney fees are awardable to a prevailing party who defends against such claim even if the alleged commercial transaction is found not to have existed. In that circumstance, attorney fees are awardable under Idaho Code § 12–120(3) even if there were other theories also asserted in support of the claim that would not

have triggered the application of the statute. *Great Plains Equip., Inc. v. Northwest Pipeline Corp.*, 136 Idaho 466, 36 P.3d 218 (2001), Therefore, if the contractual relationship asserted by Dr. Miller in his second amended complaint constituted the allegation of a claim based upon a commercial transaction between him and the Hospital, then the Hospital was entitled to an award of attorney fees under Idaho Code § 12–120(3).

Idaho Code § 12–120(3) defines a commercial transaction as "all transactions except transactions for personal or household purposes." Dr. Miller's application for medical staff privileges was not for personal or household purposes. Thus, if the contract alleged in his second amended complaint constituted a transaction, then it would be a commercial transaction under the statute. We have previously held that a transaction cannot exist under the statute unless the parties dealt with each other directly. *Ag Servs. of Am., Inc. v. Kechter*, 137 Idaho 62, 44 P.3d 1117 (2002); *Great Plains Equip., Inc. v. Northwest Pipeline Corp.*, 136 Idaho 466, 36 P.3d 218 (2001); *Brower v. E.I. DuPont De Nemours and Co.*, 117 Idaho 780, 792 P.2d 345 (1990). We have also held that a commercial transaction can exist in the absence of a contract. *Great Plains Equip., Inc. v. Northwest Pipeline Corp.*, 136 Idaho 466, 36 P.3d 218 (2001). In this case, Dr. Miller's allegation of a contract between him and the Hospital that was for other than personal or household purposes constituted the allegation of a commercial transaction. Even though we have held that no such contract existed, the Hospital was entitled to an award of attorney fees under Idaho Code § 12–120(3).

**G. Is the Hospital Entitled to an Award of Attorney Fees on Appeal under Idaho Code § 12–120(3)?**

The Hospital has requested an award of attorney fees on appeal under Idaho Code § 12–120(3). Since we have upheld the award below under that statute, the Hospital is also entitled to an award of attorney fees on appeal. *Eagle Water Co., Inc. v. Roundy Pole Fence Co., Inc.*, 134 Idaho 626, 7 P.3d 1103 (2000).

840

## IV. CONCLUSION

We affirm the judgment of the district court dismissing this action with prejudice and awarding attorney fees to the Hospital under Idaho Code § 12–120(3). We award the Hospital costs and attorney fees on appeal.

Chief Justice TROUT, and Justices SCHROEDER, KIDWELL and BURDICK concur.